SARTAIN, Judge.
This is an action based on theories of redhibition, warranty and negligence. Plaintiffs appeal from an adverse judgment in all respects. We affirm.
Nettles Excavators, Inc. (Nettles), a utility system contractor, entered into a contract with the Board of Commissioners of Water District No. 2, Cameron Parish, on July 31, 1971, for the construction of the Hackberry water system. Plans and specifications required the use of plastic pipe joined by a solvent weld technique.
Nettles purchased the pipe which was manufactured by Certain-Teed Products Corporation (Certain-Teed), through the latter’s sales representative, Musco, Inc. (Musco), at a cost of $79,742.00.
St. Paul Fire and Marine Insurance Company (St. Paul) bonded the project for Nettles.
Construction was commenced in September of 1971 and was nearly completed by July of 1972. Specifications for the project required that the system be capable of withstanding water pressure of one hundred sixty pounds per square inch.
However, after Nettles tested approximately two-thirds of the system and attempted large scale repair work, it became obvious that the system could not meet the required specifications. The engineers for the District rejected the system in its entirety and Nettles was placed in default.
Eventually a compromise was reached between the District, Nettles and St. Paul. This suit followed. Musco reconvened for $33,507.56, the balance due on the purchase price of the pipe.
In his extensive written reasons for judgment the trial judge acknowledged that the instant dispute presented “ . . . a most difficult case factually on the issue of causation, but the ultimate decision is relatively simple: Was defective pipe responsible for the failure of the system? Or, was poor workmanship and contractor’s negligence responsible for the failure?” He concluded that plaintiffs had failed to bear the burden of proving the pipe to be defective and that the resulting failure in the system was due to faulty workmanship.
In an effort to prove that the plastic pipe was defective, the plaintiffs called upon Dr. Benjamin Mosier. Defendants’ expert was Dr. James Spigarelli. As to be expected, their respective opinions varied considerably.
Dr. Mosier testified that the pipe was overplasticized which caused it to become very brittle and to split or shatter under pressure. His assertions are based on his analysis of pipe samples by infrared spectroscopy. This particular analytical procedure, according to Dr. Mosier, revealed the presence of carbonyl compounds ranging up to 17.6 percent on the six and eight inch pipes. Dr. Spigarelli’s quantitative analysis of the samples submitted to him indicated carbonyl ranging from .6 percent to .8 percent.
It is not disputed that excessive amounts of carbonyl elements render the pipe defective. In resolving the conflict in the expert testimony and accepting the opinion of Dr. Spigarelli over that of Dr. Mosier, the judge a quo stated:
“The tremendous discrepancy between Spigarelli’s findings and Mosier’s findings was not explained. Spigarelli brought his calibration curves to court with him. However, Mosier’s data were not available. This gap in data is crucial from an evidentiary point of view. Both chemists possess outstanding credentials and are obviously leaders in their field. The discrepancy between their findings, considering its magnitude, must be explainable. Without the calibration curves, Mo-sier’s findings cannot be fully explained. This fact must be considered together with two other very important factors: (1) the DeBell and Richardson tests, while only physical in nature, were very significant. If carbonyl in the quantities found by Mosier as per P-21.4 had been present in DeBell’s samples, the test results would have been affected as the samples probably would have failed the tensil or impact strength test; and (2) carbonyl of Mosier’s proportions would have affected *1260 the very extrusion of the pipe at Waco. In 1971, when the pipe in question was extruded, the raw material for same had been shipped to Waco from Social Circle, Georgia. The composition of the batch was approximately 95 parts of PVC resin. The micro-ingredients were added to the resin apparently by hand. These ingredients included the tin stabilizer, methyl, methacrylate, oxidized polyethylene, titanium dioxide, calcium stearate and paraffin wax. All these ingredients were blended in a blender and then run into the extruding process from which ultimately the PVC pipe was extruded. Had tin stabilizer been present in quantities estimated by Mosier, same would have had a dynamic effect upon the extrusion process itself. Tests run by Heilmayr indicated a 33% decrease in amperage when an 8% tin stabilizer was incorporated into the formula. If tin was present in the quantities found by Mosier, it would have been readily observable during the extrusion process. Waco’s records indicated that no extrusion problems were encountered during the manufacture of this pipe.
“The DeBell-Richardson tests for wall thickness or dimensions (ASTM 2241) indicated no problem with the six and eight-inch pipe. Mosier’s tests indicated variations in wall thickness but his field notes were not available. The six and eight-inch pipes were the only significant samples taken.
“For the reasons set forth above, the court is of the opinion that plaintiffs have failed to show by a preponderance of the evidence that there was any defect in the pipe which was manufactured by defendant’s Waco plant and sent to the Hack-berry construction site.”
The purpose of expert testimony is to assist the court in making its determination of the facts and issues. Bonilla v. Arrow Food Distributors, Inc., 202 So.2d 438 (La.App. 4th Cir. 1967), writs refused 251 La. 399, 204 So.2d 577 (1967).
The weight expert testimony is entitled to receive may be determined by the professional qualifications and experience of the expert and the facts and studies upon which his opinion is based. In the instant matter, the trial judge accorded lesser weight to Dr. Mosier’s testimony because that witness did not produce the basic supportive data upon which his opinion was based. Under these circumstances, we find no manifest error. State, Department of Highways v. McPherson, 261 La. 716, 259 So.2d 33 (1972).
The lay testimony pertains primarily to the manner in which the pipe was installed. Like that of the expert testimony it, too, was contradictory.
The proper procedure for the solvent welding of the pipe was outlined by several witnesses. First, all dirt, dust and moisture is removed from the mating surfaces of the two lengths of pipe. Then no. 10 welding solvent is brushed on the inside of the socket (female) end. This same solvent is also applied to the outside of the bell (male) end of the pipe to the socket depth. This particular solvent “cuts” into the pipe surfaces. No. 25 solvent cement is then applied to the male end while the female end is again brushed with no. 10. The two ends of pipe are then pushed together, turned a quarter turn, and permitted to “set-up” (chemically weld). Fifteen minutes to three hours setup time, depending on the size and fit of the pipe and temperature, should be allowed before disturbing the joint.
Plaintiffs rely on the testimony of George Bailey, the engineer for the system, Albert Prater, his inspector, and certain Nettles employees to show that proper installation procedures were used. However, there was testimony from others who had observed the installation that poor practices were routinely engaged in by the Nettles crews. Harold Courmier, who was employed by the District to supervise the maintenance of the completed system, in order to familiarize himself with the workings of the system, made numerous observations of the installation. He testified that on occasion he had seen the workmen join the large diameter pipe by placing a board across one end and driving it home with an eight pound sledge *1261 hammer. The superintendent on the job for Nettles, W. E. Brown, also testified to being present when this installation procedure was used.
There was also testimony that the required set-up time was not allowed to pass before the pipe was placed into the ground on numerous occasions. A set-up time of five minutes was common; on occasion less than one minute set-up was allowed. These serious deficiencies in proper installation procedures could easily have caused the problems encountered in this system. The trial judge did not commit manifest error in accepting the testimony that these practices occurred. Canter v. Koehring Co., 283 So.2d 716 (La.1973).
For the above reasons, the judgment of the district court is affirmed at appellants’ costs.
AFFIRMED.