534 So.2d 486 (1988)
Freddy J. HARMON, et al.
v.
Leslie W. LEVENSON, M.D. and Charles Steiner, M.D.
No. 88-CA-349.
Court of Appeal of Louisiana, Fifth Circuit.
November 16, 1988.
*487 Cummings, Cummings & Dudenhefer, Donna S. Cummings, New Orleans, for plaintiffs-appellants.
Adams and Reese, Edward J. Rice, Jr., New Orleans, for defendants-appellees.
Before CHEHARDY, C.J., and WICKER and GOTHARD, JJ.
CHEHARDY, Chief Judge.
Freddy Harmon, and his children, Denise A. Harmon, Freddy J. Harmon, Jr., and Ann M. Harmon, appeal a judgment dismissing their medical malpractice suit against Leslie W. Levenson, M.D., and Charles Steiner, M.D. The wrongful death and survival action was instituted by plaintiffs as a result of the death of Barbara Harmon, wife of Freddy Harmon and mother of the other plaintiffs, while she was defendants' patient at West Jefferson General Hospital in Marrero, Louisiana. We affirm.
The issue presented on this appeal is whether the trial judge was manifestly erroneous in finding the plaintiffs failed to bear their burden of proof and, consequently, in dismissing plaintiffs' suit for damages.
Barbara Harmon began experiencing shortness of breath in September 1982. In January 1983 she was hospitalized for a series of gastrointestinal tests, at which time she was referred by her family physician to Dr. Levenson, a cardiologist. After she was examined and tested, Mrs. Harmon was diagnosed as suffering from primary pulmonary hypertension of unknown etiology, a fatal disease with a poor life-span prognosis. Mrs. Harmon then was placed on an anticoagulant (blood-thinning) medication, Coumadin, in order to prevent blood clots, a common cause of death to victims of this disease.
On February 2, 1983, Mrs. Harmon began suffering respiratory discomfort and hemoptysis (coughing up blood). She was examined by Dr. Levenson at 2:00 P.M. at West Jefferson General Hospital and subsequently admitted, at which time blood gas studies were done and chest x rays taken. That evening she was given Valium to calm her and oxygen to assist her breathing.
During the evening Mrs. Harmon's progress was followed by Dr. Charles Steiner, an associate of Dr. Levenson who was familiar with Mrs. Harmon's case. He did not visit the patient during the evening or night, but remained in contact with the nursing staff. She continued to suffer from shortness of breath and hemoptysis without any significant change.
The following morning at 10:00 A.M. Mrs. Harmon's condition began to deteriorate. Dr. Levenson ordered new blood gas studies and took her off Coumadin. She was transferred to the intensive care unit, where breathing therapy ensued and Dr. Eugene Rosenberg, a pulmonary medicine specialist, was consulted. Following Dr. Rosenberg's examination, the doctors decided to restart Mrs. Harmon on another anticoagulant (Heparin) because both doctors were primarily concerned with preventing blood clots (emboli). When it became obvious Mrs. Harmon was having more bleeding problems, Heparin was discontinued. Despite these efforts, Mrs. Harmon's condition continued to deteriorate and she died the following morning from extensive pulmonary hemorrhaging in both lungs.
*488 Subsequently a medical review panel was convened. Following a decision in defendants' favor, plaintiffs filed suit. On January 26, 1988, a non-jury trial was held; on February 26, 1988, the trial judge rendered judgment in defendants' favor, dismissing plaintiffs' suit.
In a medical malpractice action the plaintiff bears the burden of proving the following facts:
"(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred." LSA-R.S. 9:2794(A).
In order to determine whether or not that burden has been met, the courts rely on expert witnesses who are members of defendant's profession and are qualified to testify. Coleman v. Touro Infirmary of New Orleans, 506 So.2d 571 (La. App. 4 Cir.1987), writ denied 507 So.2d 1247, 1248. These experts' views are persuasive, although not controlling. Id.
In general the opinion of an expert is given weight dependent upon his qualifications and experience, as well as upon the facts, including studies, upon which his opinion is based. Nettles Excavators, Inc. v. Certain-Teed Prods., 351 So.2d 1258 (La.App. 1 Cir.1977), writ denied 353 So.2d 1045 (La.1978). The opinion of an expert as to matters within his field is entitled to greater weight than the opinion on the same subject by a specialist in another field. Faust v. Lombardo, 463 So.2d 745 (La.App. 4 Cir.1985), writ denied 464 So.2d 1380.
At oral argument of this matter plaintiffs' counsel referred us to a recent medical malpractice decision of the Louisiana Supreme Court, Pitre v. Opelousas General Hospital, 530 So.2d 1151 (La.1988). In Pitre, the court discussed the duty of care owed by a physician in his profession:
"A physician has special legal obligations in connection with his profession. As any person, he `is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill.' La.Civ.Code art. 2316 (West 1988). Additionally, a general practitioner is obliged to possess the degree of knowledge or skill possessed, and to exercise the degree of care ordinarily exercised, by physicians actually practicing in a similar community under similar circumstances; a physician practicing in a specialty is required to exercise the degree of care ordinarily practiced by doctors in that specialty. La.Rev.Stat. 9:2794(A)(1). The violation of those obligations constitutes a fault which must be evaluated, taking into account the professional practices and customs by comparing the conduct of the author of the damage with the normal and regular activity of a person exercising the same profession. 2 M. Planiol, Treatise on the Civil Law, part 1 § 865A (1959)."
Plaintiffs contend Mrs. Harmon died as a result of substandard treatment and care by Drs. Levenson and Steiner. They assert her death was caused by extensive bleeding into both lungs and not by her disease or by pulmonary emboli. They contend the defendants failed to manage the dosage of the anticoagulant properly, which in turn caused the hemorrhaging, and failed to treat the hemorrhaging properly *489 after she was admitted to the hospital on February 2, 1983.
In this respect plaintiffs presented the testimony of Dr. William Luer and Dr. Paul Anderson. Dr. Luer, a pathologist, performed the autopsy on the deceased. He stated Mrs. Harmon died from extensive pulmonary hemorrhaging in both lungs. According to Dr. Luer, no emboli were present in the lungs and there was no evidence of large clots. However, evidence of previous microemboli was found.
It was Dr. Luer's opinion that the bleeding causing Mrs. Harmon's death had been occurring from the time she was admitted to the hospital. Yet he also recognized that the large volume of blood in the lungs indicated that hemorrhaging may have occurred shortly before death. Finally, Dr. Luer admitted hemorrhaging commonly occurs as a direct result of the disease itself, with no other known cause.
Dr. Paul Anderson, a cardiologist who resides and practices in California, reviewed Mrs. Harmon's medical records and testified that the care received by Mrs. Harmon was substandard. He asserted the first line of treatment for the disease, which basically causes blood pressure to build up in the lungs, should have been the use of vasodilators (drugs that open the blood vessels). Dr. Anderson stated anticoagulants should have been the second line of treatment.
Further, he testified, a determination of whether emboli existed and were causing the problem should have been made by use of a nuclear scan (which he recognized had been done twice on Mrs. Harmon) and a pulmonary angiogram. Although he admitted the angiogram would have been dangerous to Mrs. Harmon because of the pressure in her lungs, he contended it could have been done in stages.
Dr. Anderson was particularly critical of the manner in which Mrs. Harmon's anticoagulant therapy was managed. In this respect he testified that anticoagulants can cause excessive bleeding. Consequently, the patient must be closely monitored and the usual procedure for doing so is to test the coagulating time of the blood (prothrombin time). The prothrombin time is measured against a control time.
In 1983, Dr. Anderson stated, the result should not have been more than two-to two-and-one-half times the control. Mrs. Harmon's prothombin time initially was 32 seconds and, although the Coumadin dosage was reduced, her prothrombin time was still 32 when she was admitted to the hospital in February 1983. Dr. Anderson believed that the prothrombin time was excessively high since, according to her medical records, the control used was 11 seconds.
Dr. Anderson also noted that when Mrs. Harmon was admitted her blood gas studies were abnormal, her lung scan indicated a low probability of emboli, and her x rays were abnormal. Because of these factors and Mrs. Harmon's prothrombin time, he believed the defendants should have been more aware of the hemorrhage danger and Coumadin should have been discontinued when those reports were available on the evening of admission, rather than at 11:00 A.M. the next morning.
In addition, he asserted, the patient should have been transferred immediately to the intensive care unit for closer monitoring and a physician should have attended her that evening. Finally, he criticized the reinstatement of another anticoagulant, Heparin, after the interval without Coumadin. In his opinion Mrs. Harmon required reversal of the anticoagulant, by use of Vitamin K to induce clotting in order to stop the bleeding, not another anticlotting medication.
On cross-examination, Dr. Anderson admitted that in 1983 the use of vasodilators was uncommon because they were then, in fact continue to be, largely experimental. He agreed that anticoagulant therapy was the only common treatment for primary pulmonary hypertension available and in use. He also agreed that the lung scan did not preclude the existence of microemboli and admitted the use of Heparin would have had no effect on Mrs. Harmon's hemorrhage, because Heparin has a short life and it was discontinued many hours preceding her death.
*490 When the defendants presented their case, they called Dr. Rosenberg, the pulmonary specialist whom Dr. Levenson had consulted regarding Mrs. Harmon. He testified he examined Mrs. Harmon at Dr. Levenson's request and concurred totally in the treatment provided to her. He explained that pulmonary hypertension is usually associated with some type of lung disease. When found without an obvious source, he said, there is a high probability that microemboli are involved. He stated such clots can cause death and can also cause hemoptysis, as suffered by Mrs. Harmon. Thus, he testified, anticoagulant therapy has been and continues to be the common treatment for this fatal disease. In addition, Dr. Rosenberg pointed out there exists no really effective treatment for the disease at this time.
Dr. Rosenberg testified that he had considered the use of vasodilators, but had rejected them inasmuch as they were, and still are, either experimental or inappropriate. He further disagreed with Dr. Anderson's suggestion that an angiogram could have been done, since patients with Mrs. Harmon's condition have a mortality rate of 40-50% from an angiogram, due to the pressure in the patient's lungs.
In regard to the management of Mrs. Harmon's anticoagulant therapy, he testified, Mrs. Harmon's prothrombin time was not excessively high and did not require emergency reversal. He further stated he would not expect continued bleeding from either Coumadin or Heparin, once they were discontinued.
Dr. Rosenberg explained that while Mrs. Harmon's lung scan showed adverse changes from the one done in January, the indications were compatible with increased heart failure, pneumonia or pulmonary infarction (which produces emboli). He testified that even with a normal lung scan, Mrs. Harmon's history and the physical findings precluded ruling out emboli, which must be fairly large to show up on the test.
Dr. Rosenberg admitted he would have attended Mrs. Harmon personally and would have placed her in the intensive care unit when she was admitted on February 2, 1983. He also believed a physician should have seen her during the evening. However, regardless of these omissions on defendants' part, he still concluded her care was appropriate. He noted that the doctors' failure to place Mrs. Harmon in the intensive care unit or to visit her during the first night were not factors in her death.
Dr. John Cook, a cardiologist who had served as a member of the medical review panel, also testified. He informed the court that the panel unanimously found the defendants had followed the appropriate standard of care in this case and that he continued to have the same opinion. His testimony supported Dr. Rosenberg's testimony in all respects. He agreed that vasodilators were investigational at the time, that an angiogram likely would have been fatal, and that the lung scan would not necessarily have disclosed microemboli.
Dr. Cook contended further that discontinuing Coumadin without attempting to reverse its effects was an appropriate judgment call, because the concern was formation of emboli and, thus, it was necessary to provide some degree of anticoagulation. Without reversal of Coumadin's effects by Vitamin K, the anticoagulant leaves the patient's system gradually, providing some protection against emboli. Likewise, Dr. Cook agreed it was necessary to restart her on the anticoagulant Heparin. He pointed out, as well, that primary pulmonary hypertension is an uncommon disease so that, based on the information available to them, the defendants made certain judgment calls that were appropriate under the circumstances.
The defendant Dr. Steiner testified that he was on call for Dr. Levenson the night Mrs. Harmon was admitted. He explained he was familiar with her case and discussed her problems with Dr. Levenson. He stated he did not attend her personally because her condition was stable and remained stable until the following morning. Dr. Steiner testified he was in contact with the nursing staff and, had her condition warranted, he would have gone to the hospital.
*491 Dr. Steiner pointed out he did not transfer Mrs. Harmon to the intensive care unit because it would have made no difference in her treatment and because it would have prevented her family from being with her. He stated he tries not to put a patient in the intensive care unit when that cannot change the natural progress of the disease.
Dr. Steiner contended that he and Dr. Levenson believed the most likely diagnosis was pulmonary emboli and that they treated her accordingly. He agreed with Drs. Rosenberg and Cook about the inadvisibility of performing an angiogram and using vasodilators. He explained further that blood in the lungs cannot be determined by x ray because the x ray shows only that something has infiltrated the lungs; such infiltrate can be caused by pneumonia or pulmonary emboli.
Finally Dr. Levenson testified. He pointed out that microemboli frequently complicate primary pulmonary hypertension and, he said, may be the cause of the disease. He stated he and Dr. Rosenberg rejected the use of vasodilators because they were experimental and because Mrs. Harmon's pressure was too high. Along with Drs. Rosenberg, Cook and Steiner, Dr. Levenson contended it was also proper to reject the angiogram, because of the extreme risk.
Dr. Levenson discussed Dr. Anderson's criticism of his management of Mrs. Harmon's anticoagulant therapy. He stated that, at the time, the formula for the appropriate prothrombin time was two to three times the control, whereas the more recent formula is one- to one-and-one-half times the control. Thus, 32 seconds was not considered excessive in 1983, although he tried to lower that time. He also stated he eventually stopped administering Coumadin because he wanted her prothrombin time to drift into the 20's. However, he felt she still needed to be anticoagulated because of the primary risk of blood clots. Dr. Levenson testified he placed her on Heparin later for the same reason, because Heparin can be monitored easily and its effects stop faster than Coumadin's.
Dr. Levenson explained that when Mrs. Harmon was admitted, emboli were suspected because of her symptoms, the results of her tests, and her history of primary pulmonary hypertension. He pointed out that hemoptysis is usually associated with pulmonary infarction (blockage of blood vessels), which usually results from emboli. Consequently, Dr. Levenson stated, he believed she had a "run-of-the-mill" embolus on top of the pulmonary hypertension. He concluded by asserting he would treat Mrs. Harmon exactly the same if he had to do it again.
In its reasons for judgment, the trial court stated,
"The Court finds the plaintiffs did not bear their burden of proof. Although the plaintiffs should have expected a quicker response of the doctors to care for the condition of Mrs. Harmon, the Court finds this response would not have prevented the ultimate result of death. There was no breach by Dr. Levenson or Dr. Steiner of the standard of care."
Factual findings of the trial court may not be reversed or modified on appeal without a finding of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). We sympathize with the plaintiffs in the loss of Mrs. Harmon. After our review of the record, however, we cannot say the trial court was clearly wrong in making its factual findings and, consequently, in dismissing plaintiffs' suit.
The testimony in this case indicates the defendants embarked on a course of treatment for Mrs. Harmon that was consistent with her symptoms and was commonly, if not solely, used in the management of patients with primary pulmonary hypertension. Although the plaintiffs presented competent testimony in this case, their evidence was not sufficient to prove that the defendants breached the requisite standard of care in the treatment rendered Mrs. Harmon. They failed to establish that the defendants violated the standard of care set forth in R.S. 9:2794. The Supreme Court's opinion in Pitre, supra, does not establish a new or more stringent standard of care for a physician practicing in a specialty.
*492 For the foregoing reasons, the judgment of the district court is affirmed. Appellants are to pay the costs of this appeal.
AFFIRMED.