641 So.2d 664 (1994)
John O. ALELLO, Sr. and Todd Alello
v.
Wallace H. SMITH, II, M.D., et al.
No. 94-CA-103.
Court of Appeal of Louisiana, Fifth Circuit.
July 26, 1994.
*665 Charles R. Moore, Marjorie A. McKeithen, Moore, Walters, Shoenfelt & Thompson, Baton Rouge, for plaintiffs/appellants.
Elaine W. Selle, Locke, Purnell, Rain, Harrell, Stephanie M. Lawrence, Margaret Diamond, Jayne Friedland, McGlinchey, Stafford, Lang, ALC, New Orleans, for defendants/appellees.
Before BOWES, DUFRESNE and WICKER, JJ.
WICKER, Judge.
This is a psychiatric malpractice suit by a former patient (Todd Alello) and his father (John Alello, Sr.), against River Oaks Hospital and Dr. Wallace Smith, Todd's treating psychiatrist. The plaintiffs alleged that Todd's 2½ year hospitalization at River Oaks for long-term intensive psychotherapy under the care of Dr. Smith aggravated rather than alleviated Todd's drug/alcohol problems, his sexual confusion and his social maladjustment. Further, plaintiffs contended that the extended use of physical restraints rather than medication to control Todd's psychotic behavior during the early months of his hospitalization was below the standard of care for treatment of his paranoid schizophrenia. Finally, plaintiffs assert that defendants deliberately prolonged Todd's hospitalization unnecessarily in order to exhaust his insurance benefits.
*666 After a 10-day trial, the jury rendered a verdict in favor of the defendants, finding that neither Dr. Smith nor River Oaks Hospital had failed to comply with the applicable standards of care. Plaintiffs have appealed. We affirm, finding no manifest error.

FACTS
Todd Alello is the youngest of five children in a loving but chaotic and disorganized family. Todd's mother developed a serious alcohol problem when Todd was very young; she became emotionally withdrawn and depressed. At some time during his early years Todd witnessed his mother engaging in sexual behavior in the home with men other than his father. She was hospitalized several times for alcohol treatment and/or attempted suicide.
Todd began using marijuana at the age of 14. His use of illegal drugs increased as he grew older; by 1981 he was smoking eight to ten marijuana cigarettes daily and occasionally using other "street drugs" (including Quaalude, PCP, THC, and Valium). He left high school in the tenth grade. According to information in the medical record, all of Todd's siblings used drugs at one time or another.
On April 15, 1981 Todd (then 17) was brought by family members to Parkland Psychiatric Pavilion of Doctors Memorial Hospital in Baton Rouge. He was in a psychotic stateviolent, screaming and hallucinating. He was admitted under the care of Dr. Joseph Manson and was treated with antipsychotic medication (also known as psychotropic or neuroleptic drugs). He was discharged on May 11, 1981 with a discharge diagnosis of "acute schizophrenic reaction." On May 26, 1981 Todd was readmitted to Parkland, again in a psychotic state. He again was treated with psychotropic medication and was discharged on June 14, 1981 with a discharge diagnosis of "schizophrenia, simple type." On June 29, 1981 he again was admitted to Parkland in a psychotic state, and stayed through July 26, 1981. During this hospitalization Dr. Manson tried several different psychotropic drugs. The discharge diagnosis this time was "schizophrenia, undifferentiated type."
On each of those discharges from Parkland Todd had been given instructions for follow-up treatment that included seeing Dr. Manson on an outpatient basis, continuing his medication, and ceasing use of street drugs. Each time he failed to continue outpatient treatment with the doctor, discontinued his medication, and returned to using drugs.
On October 13, 1981, Todd was admitted to Greenwell Springs Hospital for treatment in a substance abuse program. Greenwell Springs discharged him eight days later, however, on the basis that Todd was an unsuitable candidate for the substance abuse program because his underlying emotional problems had not been addressed.
On August 5, 1982 Todd was readmitted to Parkland Hospital, in an acutely psychotic state, and was given trials on various psychotropic medications, none of which proved completely effective at controlling his psychotic behavior. During the course of that stay he was placed in restraints on two occasions. Eventually Dr. Manson decided that the treatment program at Parkland was not working for Todd and that he needed long-term residential treatment. He recommended to the Alellos that Todd be moved to a different psychiatric hospital and recommended several.
Mr. and Mrs. Alello selected River Oaks Hospital, which is located in New Orleans, as being the closest of the hospitals mentioned by Dr. Manson. Accordingly, on October 11, 1982 Todd was discharged from Parkland, with a discharge diagnosis of "schizophrenia, paranoid type," and was transferred to River Oaks.
During each of his hospitalizations at Parkland, Todd displayed certain characteristics and behaviors which he also later manifested at River Oaks. These included psychotic episodes in which Todd had hallucinations and delusions (e.g., stating he was Christ); intolerance of criticism from other people; preoccupation with females and sexual matters, and display of inappropriate sexual behavior; belligerence and/or violence to himself and others; suspicion and distrust of others; and inability to maintain appropriate relationships with others.
*667 Todd was admitted to River Oaks by Dr. Wallace Smith, who immediately discontinued Todd from all psychotropic medication, while tapering off the medication Todd was taking to counteract the side-effects of the psychotropic drugs. Dr. Smith also ordered a battery of physical and psychological tests for Todd in order to make an objective diagnosis of Todd's problems. After the testing was completed, Dr. Smith's diagnosis of Todd was "schizophrenia, paranoid," and "multiple drug and alcohol use and abuse." Dr. Smith discussed with Todd's parents his diagnosis and the need for long-term therapy, and advised them that such treatment would take approximately a year-and-a-half to two years. At the time Dr. Smith's sole treatment method was long-term intensive psychiatry (LTIP).
After the psychotropic medication was discontinued, Todd's psychosis became florid; his behavior was violent and uncontrollable. Within three days of the River Oaks admission, Dr. Smith found it necessary to place Todd in restraints; the use of restraints continued for the next 13 days. Approximately ten days later, it was again found necessary to employ restraints, which continued for 45 days. Thus, out of the first 72 days of Todd's hospitalization at River Oaks, he was in restraints for 58 days. The restraints involved were, variously, leather wrist and/or ankle restraints; a control chair (in which the patient is in a sitting position, strapped at the wrists, ankles and torso); or a control bed (in which the patient is strapped in a reclining position, with a sheet tightly tucked over him).
Shortly after Todd was admitted to River Oaks, he wanted to leave, but he was kept in the hospital by issuance of a physician's emergency certificate and a coroner's commitment. Subsequently Todd's parents obtained a judicial commitment to keep him at the hospital. The judicial commitment expired in December 1983; thereafter Todd remained at River Oaks voluntarily.
Despite his restraints, Todd was brought to his group therapy sessions, in the control chair when necessary, and also was undergoing individual therapy five times a week with Dr. Smith. In addition, once a week Todd and his parents participated in family therapy sessions with a social worker (although the family therapy eventually was discontinued).
After Todd had been at River Oaks for seven weeks, Dr. Smith placed him on small doses of Mellaril, an antipsychotic drug; after Todd had been on Mellaril about three weeks, his restraints were removed. He continued to be medicated with Mellaril until mid-January 1983. By February 21, 1983 his overt psychosis had subsided. No further psychotropic drugs were administered to him during the rest of his stay. Treatment by intensive psychotherapy was continued. It dealt with Todd's family problems, his sexual behavior, and his use of drugs.
While at River Oaks, and particularly while he was in restraints, Todd manifested perverse sexual behavior (e.g., public masturbation, offensive remarks to or touching of female staff members and patients). This was diagnosed as "sexual confusion," i.e., an inability to relate to females normally, in which the patient confuses caring feelings with sexual feelings, so that he interprets all women's actions toward him as sexual overtures and responds to them with inappropriate or unacceptable behavior. It was felt that this resulted from Todd's early experiences with his mother. Although Todd had exhibited some of the perverse sexual behavior previously while at Parkland, it had not been as extreme or as frequent there as it later became at River Oaks.
Among the staff members with whom Todd had daily contact were two attractive young nurses, Jessica and Caroline, to whom Todd was strongly attracted. According to Todd, part of his treatment was to allow himself to be held by Jessica and Caroline for "mothering," and he claims that while they were holding him they allowed him to touch erogenous areas of their bodies. Todd contends this not only aggravated his sexual confusion, but also caused him a psychiatric setback when the "mothering" behavior eventually was discontinued.
On cross-examination, however, Todd admitted that some of his perceptions might not have been consistent with reality, because *668 when he told Jessica he thought they could have a relationship she told him he was having delusions. Furthermore, the medical record and testimony show that he also had sexual fantasies about and exhibited inappropriate sexual behavior to a middle-aged female psychiatrist whom some of the witnesses delicately indicated was hardly the sexy type.
During much of his stay at River Oaks Todd continued to use street drugs (particularly marijuana) and/or alcohol regularly. He not only obtained them through other patients, who brought the illegal substances into the hospital, but also procured them himself when he was out on therapeutic passes. Although his drug use was discussed in his group and individual therapy sessions, it was considered to be subsidiary to his psychiatric problems. On occasions when staff members learned he had been using drugs, usually they would confront him and address the behavior. However, there were some incidents of apparent drug use over which staff members failed to confront him.
Todd was at River Oaks from October 1982 through June 1985, except for a three-month "leave of absence" from June through August 1984, in which Dr. Smith allowed Todd to return home to see if he could handle living outside the hospital. While on the leave of absence Todd returned to using drugs; his father took him back to the hospital in August 1984.
After his return Todd began manifesting apparently psychotic behavior and was placed in restraints for a total of 15 days in September/October 1984. Because staff members felt Todd's behavior was deliberate, however, the hospital administrators called a meeting with Todd and his parents. They gave Todd an ultimatum, to the effect that if his behavior continued to be violent, River Oaks would be unable to keep him and he would have to go to another hospital. Todd's "psychotic" episodes ceased thereafter.
By February 1985 Dr. Smith and the hospital staff set a projected release date for Todd of June 1985. Around this time, Todd stopped using drugs. (He testified at trial that he stopped because he knew he would not be released from the hospital as long as he continued to use drugs.) Todd remained at River Oaks until June 29, 1985, when he left on a weekend therapeutic pass and thereafter refused to return, effectively discharging himself against the advice of Dr. Smith. Further, he failed to pursue follow-up visits with Dr. Smith or to follow Dr. Smith's recommendation that he live in a halfway house, away from his parents, and work at a job in the New Orleans area.
In 1989 or 1990, Todd was arrested for exposing himself to two teenage girls in his neighborhood; part of his sentence for that crime was to undergo therapy for sex offenders, which he participated in for about a year before unilaterally deciding he no longer needed to attend the therapy. That was the only incident of deviant sexual behavior after River Oaks.
By the time of trial Todd was 29 years old and had lived with his parents ever since he got out of the hospital. He has worked at a succession of minimum-wage jobs for short periods, but resigned or was fired from each because of his problems dealing with authority figures such as supervisors and bosses. At the time of trial he was self-employed doing yard work, earning about $3,000 a year. He was married and his wife was expecting a baby; the couple was living with Todd's parents. He no longer uses drugs. He is very religious and his religion is the focus of his life. He continues to have difficulty in dealing with people in general and in interpersonal relationships, however. He refuses to seek further psychiatric help or to take psychotropic medication.

ISSUES
Plaintiffs made the following specific allegations of negligence and substandard care against River Oaks: failure to make the proper diagnosis; failure to treat Todd's drug abuse problem; treating and permitting the treatment of the diagnosed problem (paranoid schizophrenia) with substandard methods; failure to provide adequate security so as to prevent Todd from obtaining illegal drugs and alcohol while confined; failure to monitor drug and alcohol use and failure to confront and treat Todd's continued use of *669 drugs and alcohol; failure to follow and review defendant Smith's treatment plan of Todd to insure Todd was properly diagnosed and treated; permitting Todd to engage in inappropriate sexual behavior with staff members of the hospital to his detriment; permitting Todd to be hospitalized for an inappropriate duration extended in light of his diagnosis; and placing or permitting Todd to be placed in improper restraints for an unreasonable duration.
As to Dr. Smith, plaintiffs alleged that he was negligent and provided substandard care in the following ways: failure to make a proper diagnosis; failure to properly treat, control and monitor Todd's drug abuse problem; treating the diagnosed problem (paranoid schizophrenia) with substandard methods, including failure to use medication; failure to take necessary steps to prevent Todd from obtaining and using illegal drugs and alcohol while confined at River Oaks, although he knew or should have known that Todd was able to obtain and use same while confined; failure to take appropriate steps to terminate Todd's inappropriate sexual behavior with female staff members and treat the adverse consequences resulting therefrom, although the doctor knew or should have known of that behavior; permitting and/or ordering that Todd be placed in inappropriate restraints for an unreasonable period of time; and recommending and permitting Todd to be hospitalized for two-and-one-half years in light of his diagnosis.
The expert testimony established that schizophrenia is a disturbance in the way a person thinks, characterized by scattered and loose thought patterns, progressing from one idea to another in an illogical fashion. Schizophrenics function illogically, sometimes laughing at very sad events; frequently there is bizarre conduct, including behavior threatening or dangerous to the schizophrenic or others. The schizophrenic patient often is psychotic, with no real sense of control over himself and little grasp of reality, residing in an imaginary world of fantasies, delusions and grandiose beliefs. Schizophrenics may suffer visual or auditory hallucinations, at times hearing voices that direct their behavior. Such psychotic features create bizarre, abnormal behavior that significantly impairs schizophrenics' ability to relate to, communicate with, or express their feelings to other people. Schizophrenics experience extreme difficulty in trusting others, particularly when there is a paranoid component to their illness, as paranoia is a psychosis characterized by delusions of persecution, grandeur or jealousy. Schizophrenics' social interactions and interpersonal relationships suffer, thereby adding to their emotional isolation. However, schizophrenics seldom perceive their own behavior as aberrant; when they do realize their behavior is abnormal, they often blame other people or things for such conduct.
Schizophrenia is a mental disease for which there is no cure. At best, treatment with medication and/or psychotherapy can achieve only a remission of the symptoms associated with schizophrenia. Paranoid schizophrenics are unlikely to maintain employment, to establish rapport with professional help, or to function independently in their home or society.
Dr. Robert Simon, Dr. Jean Estes and Dr. Louis Cenac testified for plaintiffs as experts in psychiatry. Dr. Simon, a nationally-recognized expert on the interrelationship between psychiatry and the law, had never treated Todd, but had interviewed him and his family for purposes of this lawsuit. Dr. Estes had seen Todd as a patient on several occasions after he left River Oaks, but he had not continued in regular therapy with her. Dr. Cenac had treated Todd on an outpatient basis for a period of time, and had monitored him while he was attending group therapy for sex offenders.
All three of the plaintiff's experts stated that the treatment given to Todd, in particular Dr. Smith's failure to employ psychotropic medication to treat Todd's schizophrenia, was below the applicable standards of care because such medications have been the first-line treatment of schizophrenia since the late 1960's. They also testified that the extensive use of restraints to control Todd's psychosis was "outrageous," "totally inappropriate," "clearly excessive," because the psychosis could have been controlled by medication without physical restraints. Further, they *670 opined that the treatment had been below standard because there was no program to treat Todd's drug problem. Both Dr. Estes and Dr. Cenac admitted that they had previously been of the opinion that the River Oaks treatment did not violate the standard of care, but stated they each had changed their opinion.
Defendants presented Dr. Wallace Smith as an expert in his own behalf, as well as Dr. Joseph Manson, Dr. Robert Gibson, and Dr. John Stocks. These experts agreed that medication is the first-line treatment for schizophrenia, but they felt that it obviously had failed with Todd, as witnessed by his "revolving-door" admissions to Parkland Hospital prior to River Oaks.
Dr. Smith testified that he had removed Todd from the antipsychotic medications because those were chemical restraints which would have covered up Todd's thoughts and feelings, making them inaccessible for therapy. Further, such medication would have covered over the psychotic symptoms and prevented Dr. Smith from understanding the full extent of Todd's illness. He also testified extensively about the details of Todd's illness and psychiatric processes, and the gradual development Todd experienced through the LTIP treatment program at River Oaks.
Dr. Manson, Todd's treating psychiatrist at Parkland, testified that during Todd's first hospitalization he concluded the problem likely was schizophrenia rather than simply drug abuse: if Todd's psychosis had been due to a drug reaction he would have responded more quickly and more thoroughly to the antipsychotic medication than he did. Each time Todd was hospitalized he seemed to improve on the medication and to do well when on weekend pass to his home, so Dr. Manson would discharge him. However, Todd would cease taking his medication after he had been home for a while. Dr. Manson said that he did not consider Todd a treatment failure when he decided the boy should be transferred to a long-term residential treatment facility. Rather, he felt that Todd had never gotten sufficient continuous adequate treatment to determine whether or not he was a treatment failure, but that Todd's lack of cooperativeness made it impossible to really see good long-term effect of psychotropic medication.
Dr. Robert Gibson, director of Sheppard Pratt Hospital (a prestigious institution which pioneered research into LITP in this country), had not examined or treated Todd, but had reviewed the medical records for purposes of this litigation. He had treated schizophrenic patients with LTIP and he opined that the treatment in this case was appropriate, including the use of restraints.
Dr. John Stocks, the medical director of River Oaks Hospital, admitted that River Oaks generally no longer employs LTIP. However, he disagreed that LTIP is ineffective in treatment of schizophrenia. He pointed out that LTIP involves not just psychotherapists, but also team nursing staff, activity therapists, and support staff; thus, it is very labor-intensive compared to the pharmacological approach (treatment with pills). He stated that the change from long-term to short-term therapy at River Oaks was economically-based, and the issue was how much money the medical insurance industry would pay for treatment. The effectiveness of LTIP was not in question when the preferred treatment mode was changed from long-term to short-term.
The experts for both sides testified that schizophrenics, including Todd, should be under the care of a psychiatrist and on medication for life, because the illness is not curable.

LAW AND ANALYSIS
Malpractice claims against a hospital are subject to the general rules of proof applicable to any negligence action: the plaintiff must prove a standard of care, a breach of that standard, causation, and damages. Smith v. State through Dept. of Health and Human Resources, 523 So.2d 815, 819 (La.1988).
A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect the patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances *671 peculiarly within the hospital's control. A determination of whether a hospital has breached this duty of care it owes a particular patient depends upon the circumstances and the facts of the case.
Hunt v. Bogalusa Comm. Med. Ctr., 303 So.2d 745, 747 (La.1974).
In a malpractice action against a physician, the plaintiff must prove that the defendant physician's treatment fell below the standard of care expected of his peers in the same medical specialty, and must further prove a causal connection between the alleged negligent treatment and the injury sustained. Martin v. East Jefferson Gen. Hosp., 582 So.2d 1272, 1276 (La.1991); La. R.S. 9:2794. A physician's conduct in the treatment of a patient is always evaluated in terms of professional standards and the current state of medical science. Williams v. Hotel Dieu Hosp., 593 So.2d 783, 787 (La. App. 4th Cir.1992). A physician's judgment is also evaluated in light of facts known at the time of a patient's treatment, not on the basis of hindsight or information later learned. Moore v. Healthcare Elmwood, 582 So.2d 871, 878 (La.App. 5th Cir.1991).
Whether alleged malpractice constitutes negligence is a question for the jury. Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713, 722 (La.1986). The manifest error rule applies in appeals of medical malpractice actions. Martin v. East Jefferson Gen. Hosp., supra. It is the jury's duty to assess the testimony and credibility of all witnesses and to make factual determinations regarding these evaluations. Williams v. Hotel Dieu Hosp., supra.
In a medical malpractice case, "a reviewing court will give great deference to a jury's findings when medical experts express different views, judgments, and opinions on whether the standard of care was met in any given case." Maxwell v. Soileau, 561 So.2d 1378, 1387 (La.App. 2nd Cir.), writs denied, 567 So.2d 1123 and 567 So.2d 1124 (La.1990). Such expert opinions are necessary sources of proof whose views are persuasive, though not controlling, and any weight assigned to their testimony by the jury is dependent upon the expert's qualifications, experience, and studies upon which his testimony is based. Harmon v. Levenson, 534 So.2d 486, 488 (La.App. 5th Cir.1988). When a factfinder's decision is based on crediting the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
If the jury's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that it would have weighed the evidence differently, had it been sitting as a trier of fact. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La.1990).
Applying these principles to the facts of this case, we find no clear error in the jury verdict. With regard to whether the failure to use medication was a violation of the standard of care, the jury was entitled to accord greater weight to the testimony of the defense experts. As they pointed out, although the medication controlled Todd's psychosis as long as he took it, he always stopped taking the medication after being released from the hospital. Both Todd and his father testified to the adverse effects of the psychotropic medication on him; the experts testified that such medication has well-documented side effects which can be severe and permanent in some instances. Further, although Todd has not taken psychotropic medication since he got out of River Oaks, there is no evidence that he has had any psychotic episodes without it. The jury reasonably could have concluded that Dr. Smith's decision to discontinue all psychotropic medication was not a breach of the standard of care.
As for his sexual confusion, the jury could see that except for the episode of aberrant behavior for which he was arrested, Todd appears to be functioning as a normal young man, evidenced by his marriage and prospective fatherhood. Further, the jury reasonably could have concluded that Todd's claims regarding the behavior of Jessica and Carolyn as delusional interpretations, a finding well within the jury's province as evaluators of witness credibility.
Similarly, as to his drug use, Todd stopped using drugs by his own decision *672 while in his last few months at River Oaks. After that, his only reported episode of drug use was for a couple of months in 1987 while working in at a restaurant where drugs were prevalent among the employees. Otherwise he has been drug-free (he testified that his religious beliefs help him stay away from drugs).
We see no manifest error in the jury's determination as to the psychotic episodes, the sexual behaviors and the drug use, because all these problems involve certain elements of choice in Todd's behavior. Todd made conscious decisions to desist from the behaviors at specific points during or after his treatment at River Oaks. Certainly, under the evidence in the case, the jury reasonably could have decided that his treatment at River Oaks made him able to make those decisions or, at least, did not aggravate the already-existing problems.
The claims regarding the extensive use of physical restraints and the length of the hospitalization are more thorny issues. The expert testimony indicated that the standard of care is to avoid the use of restraints except for isolated and brief periods of time, chiefly because there are so many antipsychotic medications available to control violent behavior. (As expressed by one witness, the medication serves as a chemical restraint, making physical restraints unnecessary.) Further, the use of psychotropic medication means hospital stays are much shorter now than they were before the advent of such medicines.
On the other hand, Dr. Smith testified (in testimony supported by other defense experts) that his treatment approach at that time was entirely psychoanalytical (talk therapy); he felt that Todd needed to be entirely free of chemical influence so the doctor could examine the true extent of his psychosis and treat it accordingly. By necessity, such treatment involved lengthy treatment as an inpatient. In addition, the use of physical restraints freed the patient, during the early hospitalization, from having to control himself; in fact, patients sometimes request that they be placed in restraints when they are feeling out of control. (There was evidence that Todd requested this at least once.)
For the jury, no doubt, the "proof was in the pudding": The medical record, as well as the testimony of Dr. Manson and Dr. Smith, established that Todd did in fact improve gradually over the course of his treatment at River Oaks. Todd was 19 years old when he was admitted to River Oaks. At the time this case was tried, he was 29 years old. He has lived a fairly normal life since he left River Oaks, without the drug abuse and psychotic episodes to which he was prone before his hospitalizations.
Further, despite his and his father's testimony regarding the effect upon him of the prolonged periods in restraints, the jury reasonably could have concluded that Todd benefited overall from his treatment at River Oaks. The jury reasonably seems to have decided that Todd needed the treatment, that the treatment was appropriate, and that he was better afterwards than he was before.
Finally, although pure psychoanalytical treatment is no longer the preferred treatment for schizophrenia, it seems clear that Todd benefited by it. Such treatment, the experts agreed, requires a long hospital stay. Although Todd left the hospital when his insurance coverage expired, there is no preponderance of evidence that either the hospital or Dr. Smith deliberately extended his stay or timed his discharge to coincide with the expiration of the insurance. Rather, the lengthy stay was necessitated by the method of treatment; Todd and his father chose to discontinue treatment rather than be liable for its expense when the insurance would no longer cover it.
In summary, we see no clear error in the jury's verdict. Accordingly, the verdict of the jury and judgment of the district court are affirmed. Costs of this appeal are assessed against the appellants.
AFFIRMED.