I «THOMAS F. DALEY, Judge.
The defendant, East Jefferson General Hospital, has appealed the trial court’s judgment in favor of plaintiffs, Ronald and Stuart Beilenson. For the reasons that follow we affirm.
FACTS:
The plaintiffs’ 65 year old mother, Lois Ostrolenk, presented to the emergency room at East Jefferson General Hospital at 7:40 a.m. on the morning of October 3, 1997 with complaints of abdominal pain and nausea that had begun the previous day. She was examined by the emergency room physician, Dr. Terry Creel, and a call was placed to her primary care physician, Dr. Lawrence Levy. Blood tests revealed an elevated white blood cell count. Abdominal x-rays were reported as showing extensive fecal material throughout the colon. A CT scan of the abdomen showed dilation of the small bowel with decompression of the terminal ileum and although the report did not identify the actual point of obstruction, her admitting diagnosis was to rule out small bowel obstruction.
[4She was transferred to a medical floor in the hospital at 3:00 p.m. At approximately 3:25 a.m. on the morning of October 4, 1997 she was found to be short of breath and coughing up brown mucus. Shortly thereafter, Ms. Ostrolenk was found to be not breathing with a large amount of dark brown emesis in her mouth. Resuscitation efforts were unsuccessful and Ms. Ostrolenk was pronounced dead at 4:11 a.m.
The plaintiffs instituted a medical malpractice suit against the physicians caring for Ms. Ostrolenk, as well as the hospital seeking to recover damages for the wrongful death of their mother, as well as a survivor action on her behalf.
At trial, Timothy Hilbun, a licensed practical nurse, testified that he had been practicing nursing for about one year on the day he was assigned to take care of Ms. Ostrolenk. Nurse Hilbun was working the 3-11 shift on October 3, 1997. He testified that Ms. Ostrolenk was alert and oriented, calm and cooperative, and had no respiratory distress. He testified that he was aware of the orders given by Dr. Levy that the doctor should be called if there was any increased nausea and vomiting. He further testified that he was aware that after Dr. Levy examined Ms. Ostrolenk, Dr. Levy wrote an order to notify the doctor of any changes. Nurse Hilbun testified that at 6:45 p.m. he telephoned the doctor on call for Dr. Levy, Dr. Ramiz Khalaf, to let him know that Ms. Ostrolenk had vomited. Nurse Hilbun testified that Dr. Khalaf s response was to let him know *77 if she vomited again. Nurse Hilbun testified that he was not aware of another vomiting episode on his shift. He was shown a note in Ms. Ostrolenk’s medical record dated October 3, 1997 written at 7:20 p.m. by Karen deLeon, a respiratory therapist, that states: “aerosol treatment not given, patient became ill; patient vomiting.” Nurse Hilbun denied being aware that Ms. Ostrolenk had vomited at 7:20 p.m., but testified that had he been informed of this incident, he would have written it in the medical chart | fiand called the doctor. Nurse Hilbun testified that he went over Ms. Ostrolenk’s condition with the oncoming nurse and left the hospital at 11:30 p.m.
Karen deLeon, a certified respiratory therapist, testified that she had no recollection of Ms. Ostrolenk. She testified that on Ms. Ostrolenk’s medical chart she checked off that the aerosol treatment was not given and the patient became ill and wrote in that the patient was vomiting. Ms. deLeon had no recollection of whether or not she spoke to the nurse, nor did she have any recollection of whether she had actually gone into Ms. Ostrolenk’s room.
Gwen Bylsma, a registered nurse, testified that she assumed Ms. Ostrolenk’s care from Nurse Hilbun. Nurse Bylsma testified that she was aware that Ms. Ostrolenk had vomited at 6:45 p.m. She acknowledged that the respiratory note indicated that Ms. Ostrolenk had vomited again at 7:20 p.m. but testified that she was not aware of this episode at the time she was caring for Ms. Ostrolenk. Nurse Bylsma testified that she first went into Ms. Ostro-lenk’s room at 12 midnight. She noted that there was feces on the floor and on the chair and that Ms. Ostrolenk was awake but confused with her intravenous line disconnected. Nurse Bylsma testified that she reconnected the intravenous line and changed Ms. Ostrolenk’s linens. Nurse Bylsma testified that while she was aware there was an order to call the doctor for any changes, she did not notify the doctor about Ms. Ostrolenk’s confusion because it is not unusual- for patients to be awakened during the night in the hospital and not think clearly. She explained that the contrast material Ms. Ostrolenk had to drink for the CT scan can give patients diarrhea and it was her impression that Ms. Ostrolenk had gotten up quickly to go to the bathroom, forgetting that she had an intravenous line, and dropped stool on her way. Nurse Bylsma testified that she returned to Ms. Ostrolenk’s room at 2:00 a.m. to administer medication through the intravenous line and if Ms. Ostrolenk had been in any distress she would have noted it in the medical record.
| (jNurse Bylsma testified that she went into Ms. Ostrolenk’s room at approximately 3:25 a.m. and found her to be slightly short of breath with coarse breath sounds. Ms. Ostrolenk asked Nurse Bylsma to retrieve a tote bag containing her asthma medication for her. Nurse Bylsma complied. Nurse Bylsma explained that she thought Ms. Ostrolenk was in need of a respiratory treatment, so she left the room and walked to the nurse’s desk to page a respiratory therapist. Nurse Bylsma testified that she informed the other personnel sitting at the desk that-Ms. Ostrolenk was in need of a respiratory treatment. Nurse Bylsma testified that when she returned to Ms. Ostrolenk’s room at approximately 3:29 a.m. she found Ms. Ostrolenk to be .cyanotic without a pulse or respira-tions with a large amount of dark brown emesis in and around her mouth. At this point, Nurse Bylsma called a “code” and resuscitation efforts were begun.
Nurse Bylsma explainéd that she did not call the doctor at 3:25 a.m. when she first noted the shortness of breath because she thought a respiratory treatment would re *78 solve this problem. Nurse Bylsma further explained that she did not think Ms. Ostro-lenk was in acute distress and that it was faster for her to go to the nurse’s desk to call the respiratory therapist than it was for her to call from Ms. Ostrolenk’s room.
Dr. Lawrence Levy, an expert in internal medicine and Ms. Ostrolenk’s treating physician, testified that he had treated Ms. Ostrolenk since 1989. Dr. Levy testified that while the CT scan showed some dilitation of the small bowel, he felt that Ms. Ostrolenk did not have a small bowel obstruction; rather, he opined that these changes were due to not having a bowel movement. He opined that Ms. Ostro-lenk’s most likely diagnosis was diverticulitis.
Dr. Levy explained that a nasogastric tube can be placed through the patient’s nose into their stomach and is used to remove gastric contents, decompress the intestines, and prevent patients from aspirating vomited gastric 17contents into their lungs. Dr. Levy testified that he did not feel that Ms. Ostrolenk required a naso-gastric tube because her abdomen was not distended. Dr. Levy testified that he consulted a surgeon, Dr. Norman, to evaluate Ms. Ostrolenk and Dr. Norman did not feel that Ms. Ostrolenk needed a nasogas-tric tube, nor did he feel Ms. Ostrolenk had a small bowel obstruction.
Dr. Levy testified that he would have expected Ms. deLeon to notify Nurse Hil-bun about the vomiting episode at 7:20 p.m. and that if she failed to do so, this was a breach of the standard of care. Dr. Levy further testified that Nurse Bylsma’s failure to notify the doctor on call of the confusion observed in Ms. Ostrolenk at midnight was a breach of the standard of care based on his order stating to notify the doctor of any changes.
Dr. Levy testified that he wrote a death summary in Ms. Ostrolenk’s medical records, which stated that Ms. Ostrolenk developed mild respiratory distress and “apparently aspirated a large amount of GI contents”. This summary further states that Ms. Ostrolenk was intubated “with large amount of fecal-like material returning from the lungs.” The summary goes on to state that she had “respiratory distress with severe aspiration and hypoxia, cardiopulmonary arrest.”
Dr. Ramiz Khalaf testified that he was on call for Dr. Levy the night of October 3, 1997. Dr. Khalaf testified that he had no specific recollection of being called regarding Ms. Ostrolenk. He acknowledged that the medical records indicate that there was a second vomiting episode. Dr. Khalaf explained that had he been informed of the second episode he would have considered going to the hospital to examine Ms. Os-trolenk, but this would have depended on the information received when he questioned the nurse. Dr. Khalaf testified that in order to determine if a nasogastric tube was needed, he would have to have information about the amount and number of times of vomiting, the appearance of the abdomen, and the patient’s overall condition, including vital signs.
|RPr. Terry Creel was qualified by the court as an expert in emergency medicine. Dr. Creel testified that he had no independent recollection of treating Ms. Ostrolenk in the emergency room and that his testimony was based on the medical record. Dr. Creel opined that Ms. Ostrolenk did not have a small bowel obstruction because she had to drink a large amount of contrast material for the CT scan and she would have been unable to do so in the presence of an obstruction. Dr. Creel testified that it was his impression that Ms. Ostrolenk had diverticulitis with an ileus. He explained that an ileus is not a mechanical obstruction, rather it is an area of the bowel that stops working. Dr. Creel ac *79 knowledged that he wrote his clinical impression into the medical record was “abdominal pain, bowel obstruction,” and that his note does not mention diverticulitis. Dr. Creel denied that Ms. Ostrolenk required a nasogastric tube.
Dr. Robert Norman was qualified by the court as an expert in general surgery. Dr. Norman testified that he examined Ms. Ostrolenk at the request of Dr. Levy. He opined that it was unlikely that Ms. Ostro-lenk had a bowel obstruction; rather, the most likely diagnosis was diverticulitis. Dr. Norman testified that a nasogastric tube was not necessary at 6:45 p.m.; however, he would have considered placing a nasogastric tube had he known of the vomiting episode at 7:20 p.m.
Dr. Richard Deno was qualified as an expert in emergency medicine. Dr. Deno testified that he responded to Ms. Ostro-lenk’s attempted resuscitation, although he had no specific recollection of the event outside of his note in the medical record. Dr. Deno testified that when he went into Ms. Ostrolenk’s room, she had no heart rate and there were gastric contents in her mouth. He inserted an - endotracheal tube and suctioned feculent smelling material from her lungs. Dr. Deno admitted that the note he wrote describes this material as fecal matter, but explained that it was not stool. He further testified that he did not know if Ms. |flOstrolenk aspirated and then her heart stopped beating or if her heart stopped beating and then she aspirated. Dr. Deno was unable to give a cause of death although he stated he had no reason to disagree with the death summary written by Dr. Levy.
Dr. William Barnhardt, an expert in internal medicine, testified on behalf of the plaintiffs. Dr. Barnhardt opined that Ms. Ostrolenk had an obstruction near the end of her small bowel based on the findings on the CT scan. Dr. Barnhardt testified that the CT scan did not support a diagnosis of diverticulitis. Dr. Barnhardt further testified that the complaints of “crampy abdominal pain” are consistent with small bowel obstruction. Dr. Barnhardt testified that the treatment of a small bowel obstruction requires the insertion of a naso-gastric tube to remove the contents of the stomach and prevent the patient from aspirating gastric contents into their lungs. Dr. Barnhardt testified that Dr. Levy violated the standard of care by not ordering the insertion of a nasogastric tube. He further testified that Dr. Khalaf violated the standard of care by not coming to the hospital to examine Ms. Ostrolenk and by not ordering a nasogastric tube when he was notified that she had vomited. Dr. Barnhardt opined that had a nasogastric tube been placed, Ms. Ostrolenk would not have died. Dr. Barnhardt testified that Ms. deLeon breached the standard of care by not informing Nurse Hilbun that Ms. Ostrolenk had vomited at 7:20 p.m.
Dr. Barnhardt testified that Nurse Byls-ma violated the standard of care by not notifying the doctor on call of the confusion noted in Ms. Ostrolenk at midnight. Dr. Barnhardt further testified that Nurse Bylsma violated the standard of care by leaving Ms. Ostrolenk unattended at 3:25 a.m. when she noted shortness of breath and brown mucus. Dr. Barnhardt testified that the standard of care required that Nurse Bylsma remain at Ms. Ostrolenk’s bedside to keep her airway open. Dr. Barnhardt explained that Ms. Ostrolenk was unable to get the vomitus | inout of her mouth because she was confused. He further explained that if Ms. Ostrolenk did not have a bowel obstruction, she would not have had such a large amount of vomi-tus.
Jane Brannon, who was qualified by the court as an expert in nursing, testified on behalf of the plaintiff. Ms. Brannon testi *80 fied that she would have expected Ms. deLeon to notify Nurse Hilbun of the vomiting episode at 7:20 p.m. Ms. Brannon explained that Nurse Bylsma breached the standard of care when she did not notify the doctor of Ms. Ostrolenk’s confusion. Ms. Brannon testified that Nurse Bylsma again breached the standard of care by leaving the room when Ms. Ostrolenk was short of breath at 3:25 a.m. Rather than leaving the room, Nurse Bylsma should have remained in the room and turned Ms. Ostrolenk’s head to the side and leaned her forward to prevent the vomitus from entering her lungs.
Dennis Guillot, who was qualified by the court as an expert in respiratory therapy, testified on behalf of the plaintiffs. Mr. Guillot testified that Ms. deLeon did not meet her duty at 7:20 p.m. when she noted that Ms. Ostrolenk had vomited and she failed to tell the nurse. Mr. Guillot read an excerpt from the published standards of care for respiratory therapy relative to the therapists’ duty to communicate information to the appropriate members of the health care team.
Dr. Hebert Mayer, an expert in internal medicine, testified that he served on the medical review panel in this matter. Dr. Mayer testified that the CT scan showed an obstruction and the treatment of this condition is based on how the patient progresses. Dr. Mayer explained that a naso-gastric tube is used to make the patient more comfortable and decreases the risk of aspiration. He was unable to state whether he would have ordered a nasogas-tric tube at 6:45 p.m. He testified that if the respiratory therapist did not tell the nurse about the vomiting episode at 7:20 p.m., he would “have a problem with that.” Dr. Mayer further testified that the nurse’s failure to report the change in Ms. 'Ostrolenk’s condition to the doctor |nat midnight was a breach of the standard of care. Dr. Mayer also testified that it was a breach of the standard of care for Nurse Bylsma not to call the doctor at 3:25 a.m. when Ms. Ostrolenk was found to be short of breath and coughing up brown mucus. Dr. Mayer testified that he did not know if the aspiration was the cause of Ms. Ostro-lenk’s death or if her death was caused by something else since there was no autopsy.
Dr. John Cokemor, an expert in internal medicine, testified that he served on the medical review panel in this matter. Dr. Cokemor testified that Ms. Ostrolenk did not require a nasogastric tube because her abdomen was soft and she had active bowel sounds, which are indications that her intestines were working. Dr. Cokemor testified that the CT scan did not show a small bowel obstruction; however, he conceded that diverticulitis could cause an area of her small bowel to be partially blocked. Dr. Cokemor did not feel Nurse Bylsma violated the standard of care by not calling the doctor at midnight because the drugs administered for pain caused Ms. Ostrolenk to be confused. While Dr. Cokemor testified in his deposition that the failure of the respiratory therapist, Ms. deLeon, to notify Nurse Hilbun of the vomiting episode at 7:20 p.m. was a breach of the standard of care, he denied that this was a breach when he testified at trial. Dr. Cokemor reluctantly admitted that Nurse Bylsma’s failure to call the doctor at midnight was a breach of the standard of care.
Stuart Beilenson testified that he is 45 years old and lives in Miami, Florida. He was the middle of Ms. Ostrolenk’s three sons. He described his childhood in which his father left when he was a young child and his mother raised him and his three brothers alone. His older brother later died of leukemia. He described taking family vacations in which his mother taught him and his brothers songs that *81 were passed on to their own children. Mr. Beilenson testified that he was “always in contact” with his mother and that his children came to visit her with and without hahim. Mr. Beilenson read the jury a letter that he wrote to his mother after her death updating her on family events and detailing how his life had changed without her. He specifically referred to needing her to help raise the two children he was raising alone and missing her on the holidays.
Ronald Beilenson testified that he is 43 years old and lives in Austin, Texas. His described his childhood in which his mother taught music lessons at home before and after school and taught music at the school he and his brothers attended during the day. In the evenings she directed various musical events and he and his brothers participated in these events. He testified that his mother taught he and his brothers to play various musical instruments. Ronald Beilenson explained that when he graduated from college, he changed his name to his mother’s maiden name to honor her because his father did not provide for the family. Mr. Beilenson testified that he and his mother were close and they got together and spoke on the phone “all the time.” Various pictures of Ms. Ostrolenk and her sons and grandchildren were introduced into evidence, as well as numerous newspaper articles describing Ms. Ostrolenks musical accomplishments. A videotape of the family was played for the jury.
At the conclusion of trial, the jury found that Dr. Levy did not violate the standard of care and that Dr. Khalaf did violate the standard of care, but his conduct was not a proximate cause of Ms. Ostrolenk’s death. The jury further found that East Jefferson, through its employees, failed to comply with the standard of care and that this failure was the proximate cause of Ms. Ostrolenk’s death.. The jury awarded the stipulated medical and funeral expenses in addition to damages for wrongful death and survivor damages. Because East Jefferson General Hospital is a public entity, the trial judge rendered judgment in favor of plaintiffs and against East Jefferson in .the following amounts:
$100,000.00 Survival action
|13$175,000.00 Ronald Beilenson’s wrongful death action
$175,000.00 Stuart ' Beilenson’s wrongful death action
The stipulated medical and funeral expenses were awarded and East Jefferson was east with costs.
The Louisiana Patients’ Compensation Fund, (hereinafter referred to as the Fund) as the party responsible for damages in excess of $100,000.00 against East Jefferson General Hospital, which is a qualified healthcare provider under the Louisiana Medical Malpractice Act, filed this suspensive appeal. East Jefferson did not appeal. Plaintiffs filed an answer to the appeal claiming the damages awarded were inadequate.
LAW AND DISCUSSION:
On appeal, the Fund argues the trial court erred in allowing plaintiffs to call two expert witnesses (Ms. Brannon and Mr. Guillot) who were not timely disclosed, claiming this testimony prejudiced defendants who were unable to add experts to offer countervailing opinions.
In order to prevail in a medical malpractice action, the plaintiff must establish the standard of care applicable to the particular specialty in question, a breach of that standard, and that the breach was the cause of plaintiffs damages. Plaintiffs called Ms. Brannon, a registered nurse, to testify as to the standard of care for nurses and to render an opinion as to the conduct of Nurses Hilbun and *82 Bylsma and Mr. Guillot, a respiratory therapist, to testify as to the standard of care for respiratory therapists and to render an opinion as to the conduct of Karen deLeon.
Defendants point out that the trial court ordered that all discovery be completed 30 days prior to the pre-trial conference set for November 5, 2003 with trial being scheduled to start December 1, 2003. At the pre-trial conference on 1 uNovember 5, 2003, plaintiffs identified Nurse Brannon and respiratory therapist Guillot as expert witnesses. At this point numerous depositions had been taken in which the plaintiffs questioned the witnesses regarding whether the conduct of Nurses Hilbun and Byls-ma and Ms. deLeon violated the standard of care of their respective professions. Although these depositions were not admitted into evidence, it is clear from the testimony at trial that in these depositions plaintiffs were attempting to establish that Ms. deLeon violated the standard of care for respiratory therapists by not notifying Nurse Hilbun of the 7:20 p.m. vomiting episode and that Nurse Bylsma violated the standard of care for nurses by not notifying a doctor of Ms. Ostrolenk’s confusion at midnight and leaving Ms. Ostro-lenk’s bedside just prior to her death. Thus, East Jefferson was aware that the plaintiffs were claiming the conduct of these two nurses and the respiratory therapist violated the standard of care and that this violation was a cause of Ms. Ostro-lenk’s death.
At the time East Jefferson became aware that plaintiffs intended to call Nurse Brannon and respiratory therapist Guillot, trial was one month away. Rather than take the deposition of these experts and possibly obtain their own experts to counter the testimony of plaintiffs’ experts, East Jefferson chose to wait until the morning of jury selection to file a Motion to Strike these two witnesses[1]. East Jefferson’s Motion to Strike was filed on December 1, 2003 and was denied by the trial court on December 2, 2003. East Jefferson took the depositions of Nurse Brannon and respiratory therapist Guillot on December 2, 2003. East Jefferson’s Emergency Supervisory Writ Application to this Court was denied on December 3, 2003, the date of opening arguments. Because East Jefferson had knowledge that plaintiffs intended to call Nurse Brannon and respiratory therapist Guillot a month 11fiprior to trial and East Jefferson made no attempt to depose these experts and/or add experts to rebut the plaintiffs’ expert testimony, we see no error in the trial court’s denial of East Jefferson’s Motion to Strike and the allowance of the testimony of these experts.
The Fund goes on to argue that physician testimony cannot be used to establish the standard of care for a nurse or a breach of the standard of nursing care. The Fund then asks this court to rely on a recent case in Illinois to support its position that testimony of a physician cannot be used to establish the standard of care for nursing and a breach of that standard of care. We disagree with the Fund’s position. There are numerous cases in the Louisiana jurisprudence that have relied on the testimony of a physician to find a breach of the standard of care by a hospital through its nurse-employees. See Bellard v. Willis Knighton Medical Center, 34,360 (La.App. 2 Cir. 5/9/01), 786 So.2d 218; Piro v. Chandler, 33,953 (La.App. 2 *83 Cir. 11/1/00), 780 So.2d 394; Gordon v. Willis Knighton Medical Center, 27,044 (La.App. 2 Cir. 6/21/95), 661 So.2d 991, writ denied, 95-2776 (La.1/26/96), 666 So.2d 679 and writ denied, 95-2783 (La.1/26/96), 666 So.2d 679. We see no error in the trial court’s allowance of the physicians to testify in this case regarding the standard of care of the nurses.
Additionally, our review of the record indicates that there was no objection by East Jefferson in the trial court regarding the physicians testimony related to the standard of care for nurses and respiratory therapists. To preserve an evidentiary issue for appellate review, it is essential that the complaining party enter a contemporaneous objection to the evidence or testimony and state the reasons for the objection. Rose v. Cablevision of Shreveport, 32,855 (La.App. 2 Cir. 4/5/00), 755 So.2d 1039. East Jefferson’s failure to object to the physicians’ testimony regarding the standard of care for nurses and respiratory therapists in the trial court precludes this Court from addressing that issue on appeal.
|1(iIn its third Assignment of Error, the Fund argues that because there was no determination as to the cause of death, this pretermitted a finding of causation. The Fund contends that the plaintiffs’ case was based on the allegation that the failure to insert a nasogastric tube would have avoided aspiration which led to Ms. Ostro-lenk’s death. We disagree with the Fund’s assertion that there was no determination as to the cause of death. The death summary prepared by Dr. Levy, Ms. Ostro-lenk’s treating physician, shortly after Ms. Ostrolenk’s death lists the death diagnoses as: “1. severe aspiration, 2. hypoxia, 3. cardiopulmonary arrest, 4. acute diverticulitis, 5. asthma.” Dr. Levy explained that aspiration leads to hypoxia which leads to cardiopulmonary arrest. Dr. Barnhardt testified that a nasogastric tube would have removed the contents of Ms. Ostro-lenk’s stomach, therefore, there would have been no (or a very small amount) contents to aspirate. Every physician who testified agreed that the insertion of a nasogastric tube decreases, if not eliminates, the risk of aspiration. Dr. Barn-hardt testified repeatedly that had a naso-gastric tube been inserted Ms. Ostrolenk would not have died.
East Jefferson attempted to establish that the cause of Ms. Ostrolenk’s death could not be determined because there was no autopsy. They attempted to establish that her death could have been caused by a massive myocardial infarction or a pulmonary embolism. However, Dr. Barnhardt testified that there was absolutely no support in the medical record to show that Ms. Ostrolenk died of something other than hypoxia caused by aspiration. The trial court chose to believe the testimony of Dr. Barnhardt over that of the defendants’ witnesses. When there are two permissible views of the evidence, the factfinder’s choice cannot be clearly wrong or manifestly erroneous. Karagiannopoulos v. State Farm Fire & Cas. Co., 94-1048 (La.App. 5 Cir. 11/10/99), 752 So.2d 202. Thus, we |17find no merit to the Fund’s argument that the plaintiffs failed to carry their burden on causation.
Next, the Fund argues that the trial court erred in awarding $100,000.00 in survival damages claiming there was no evidence of conscious suffering by Ms. Os-trolenk prior to her death. We disagree.
Dr. Mayer testified that Ms. Ostrolenk was “probably sicker in the ER than most people recognized.” Ms. Ostrolenk was in the emergency room from 7:45 a.m. until 3 p.m. on the day prior to her death. She was in the hospital approximately 20 hours prior to her death. Dr. Barnhardt opined *84 that the cause of Ms. Ostrolenk’s confusion at midnight was related to a metabolic imbalance caused by her illness. Thus, there is evidence in the record to indicate that Ms. Ostrolenk suffered up to 20 hours while in the hospital prior to her death.
Nurse Bylsma’s midnight note indicates that Ms. Ostrolenk was confused and defecated on the floor and chair of her room and was lying in bed in soiled linens at midnight. The next entry in the nurses notes states that Ms. Ostrolenk was short of breath and coughing up “brown mucus.” The medical, records and testimony at trial indicate that the “brown mucus” was fecal matter. The medical records indicate that Ms. Ostrolenk was found with a large amount of “dark brown emesis” in and around her mouth and after Ms. Ostrolenk was intubated a “large amount of fecal material” was suctioned from her throat and lungs. Dr. Barnhardt explained that Ms. Ostrolenk drowned after aspirating her gastric contents, which contained fecal matter.'
An appellate court may only increase or decrease the damage award rendered by the trial court if the court finds that the trial court abused its discretion in making the award. Due to the great discretion given to the trial court, an appellate court rarely disturbs an award of general damages; only when the record clearly shows that the trial court abused its discretion in awarding damages in | iseither direction beyond that which a reasonable trier of fact would assess for the effects of a particular injury on a particular party under the particular circumstances should an appellate court either increase or decrease the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
While we find that the- $100,000.00 award for survivor damages in this case to be on the high side, this award is supported by the testimony. Dr. Mayer testified that Ms. Ostrolenk was “probably sicker than anyone realized” while in the emergency room. There was testimony that she vomited on one and possibly two occasions. Furthermore, the testimony indicates that Ms. Ostrolenk may have aspirated gastric material prior to her death, i.e. she coughed up brown mucus. Additionally, there are several cases in which high awards have been affirmed in a survivor action when the decedent suffered a short amount of time. See Ruttley v. Lee, 99-1130 (La.App. 5 Cir. 5/17/00),761 So.2d 777; In re Medical Review Panel (Billelo), 621 So.2d 6 (La.App. 4 Cir.1993). Thus, we find no abuse of discretion in the award made by the trial court for the survival action.
Finally, we address the wrongful death awards adjudicated to Ms. Ostro-lenk’s sons. As stated above the trial court awarded $175,000.00 to each of Ms. Ostrolenk’s adult son’s for the wrongful death of their mother. The Fund contends this award is an abuse of discretion and suggests it be lowered while the plaintiffs answered the appeal and request the amount be increased.
Stuart and Ronald Beilenson both testified that their father deserted the family when they were young children and explained that their mother functioned as both a mother and father. They testified extensively as to them mother’s musical accomplishments and her teaching of music to her children and as to their involvement in her musical and theater productions. While both sons lived out of state they both testified that they had frequent contact with their mother, which was ^evidenced by the many pictures admitted into evidence. Some of these pictures *85 were taken only five days prior to Ms. Ostolenk’s death. A videotape of the family was also shown to the jury. In the letter written by Stuart, he expressed his longing for his mother to assist him in raising his children alone, particularly his teenage daughter. Ronald’s letter spoke of his newest child whom his mother had never seen.
While we find an award of $175,000.00 to a major child for the loss of a parent to be high, similar high awards have been affirmed based on the particular facts of the particular cases. See Simmons v. CTL Distribution, 03-1301 (La.App. 5 Cir. 2/23/04), 868 So.2d 918; Ly v. State 633 So.2d 197 (La.App. 1 Cir.1993). In the case before us, both sons testified that their mother acted as both mother and father and although they lived out of State they had frequent contact with their mother. The testimony showed a close and loving relationship between Ms. Ostrolenk and her sons. Thus, we find no abuse of discretion in the awards given to plaintiffs for the wrongful death of their mother.
For the foregoing reasons, the judgment of the trial court is affirmed.

AFFIRMED.

I,REHEARING GRANTED:

Rehearing is granted in this matter for the limited purpose of amending the judgment to award legal interest in accordance with L.S.A.-R.S. 40:1299.47 M.
/s/ Thomas F. Daley Judge
/s/ Marion F. Edwards Judge
/s/ Walter J. Rothschild Judge

. The jury was selected, on December 1, 2003 and opening arguments were presented December 3, 2003. As the parties were informed prior to trial, the trial court heard its criminal docket on December 2, 2003. On December 2, 2003, the depositions of plaintiffs' experts, as well as the deposition of Dr. Deno, a defense witness, were taken.