927 So.2d 1218 (2006)
Conran J. FRICKE and Kim Fricke
v.
OCHSNER FOUNDATION HOSPITAL and Debra Mills, R.N.
No. 05-CA-868.
Court of Appeal of Louisiana, Fifth Circuit.
April 11, 2006.
Rehearing Denied May 18, 2006.
*1219 Eulis J. Simien, Jr., Simien & Simien, L.L.C. Baton Rouge, Louisiana, for Plaintiff/Appellant.
Harry T. Lemmon, New Orleans, Louisiana, for Plaintiff/Appellant.
Pamela Ashman, Baton Rouge, Louisiana, for Plaintiff/Appellant.
Don S. McKinney, Adams and Reese, LLP, New Orleans, Louisiana, for Defendant/Appellee.
Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS, and WALTER J. ROTHSCHILD.
MARION F. EDWARDS, Judge.
Plaintiff/appellant, Conran J. Fricke ("Fricke"), appeals a jury verdict in favor of defendant/appellee, Alton Ochsner Medical Foundation ("Ochsner"), dismissing his claim of medical malpractice. We affirm for the following reasons.
Fricke avers that, on December 19, 1996, he was admitted to Ochsner for corrective surgery on his right hand for carpal tunnel syndrome. While preparing him for surgery, Nurse Debra Mills ("Mills"), an employee of Ochsner, gave him an injection of Novocain in his left hand and then attempted to insert an IV needle into the vein at his wrist. At that time, Fricke stated he experienced a severe electric shock sensation in his arm. After reporting this to Mills, she withdrew the needle and then attempted, unsuccessfully, to reinsert it. An anesthesiologist was later able to accomplish the procedure. Fricke alleged that, as a result of improper methods used by Mills, he experienced an injection injury and suffered Reflex Sympathetic Dystrophy and other damages as a consequence.
On October 19, 1999, a medical review panel unanimously concluded that the evidence supported the conclusion that Ochsner failed to meet the applicable standard of care. At that time, the panel determined that paraesthesia is a known complication of venipuncture and when the patient reported paraesthesia, the nurse should have tried a completely different site. According to the panel:
We must assume that the second venipuncture attempt may have aggravated the nerve injury. The initial attempt created a paraesthesia which was probably the inciting mechanism. However, it is impossible to know whether the first or second venipuncture attempt caused the initial injury.
In 2001-2002, the members of the panel executed separate affidavits attesting that, after review of Fricke's deposition, they concluded the nerve injury occurred on the first stick. Fricke had stated he felt a strong electrical sensation on the first attempt and felt no sensation on the second, and this information caused them to alter their original opinions. According to the affidavits, there was no evidence that the first attempt was negligently made, and an injury on a first attempt may occur in the absence of negligence. Thus, the individual members concluded, as per their affidavits, that there was no breach in the standard of care.
In the Petition For Damages, Fricke named Ochsner and Mills as defendants. Mills was eventually dismissed from the lawsuit because Fricke stipulated that she was acting in the course and scope of her employment with Ochsner when the injury occurred, and Ochsner was responsible for any proven acts of negligence on her part.
Trial on the merits was conducted over a period of several days, at the conclusion of which the jury returned a verdict, finding the evidence did not prove that Nurse Mills lacked the necessary degree of knowledge or skill exercised by a health care provider, or that she failed to use reasonable care along with her best judgment with regard to Fricke. The verdict *1220 was made the judgment of the court. Following the denial of Fricke's Motion For Judgment Notwithstanding The Verdict, or in the alternative, Motion For New Trial, Fricke perfected the present appeal.
Fricke testified at trial that he had been diagnosed with carpal tunnel syndrome and decided to have surgery in December of 1996. When he went for the surgery, Mills came in to check his vital signs, looked at his hands, and told him he had good veins. She put a tourniquet on, gave him a small stick, and proceeded to insert the IV. Fricke testified that Mills had given him the Lidocaine stick in his hand, before inserting the IV in his wrist. When she tried to start it, he got a terrible electrical shock up his arm and he yelled, telling her that it hurt and he had a shocking feeling. She took the needle out. He watched, although he squinted his eyes, as she tried again, close to the same area, although he did not know exactly how close or whether it was in the same spot. Fricke did not recall if he felt pain the second time. On the second attempt, Mills missed the vein, and called in someone else, saying she thought she hit a valve. A second person from anesthesiology came in to insert the IV. Fricke had previously had two surgeries on the ulnar nerve in his left arm, some years prior, because he had been bitten on the hand and was having pain in his hand and wrist.
At trial, Mills testified that she had been a registered nurse since 1969. She started doing IVs at Ochsner in 1985 when she worked in the holding area, getting patients ready for surgery. She typically started about 20-25 IVs a week, and that the nurses start more IVs than the anesthesia department. She prefers to start IVs in the hand, because it is easier to hold a patient's hand and anchor it.
She testified that the best place to start an IV is a large vein that does not curve very much. IVs are often started in the wrist. Over the years, she has started IVs in every part of the hand and wrist. Whatever prominent vein appears first, if it is in a comfortable position, is the one she would use. Nurse Mills applied a tourniquet, but was not certain if she palpated Fricke's hand before attempting venipuncture, because sometimes a large vein just pops out. Before inserting an IV, she would first stick the patient with Lidocaine to numb the point of insertion. She has never attempted to start an IV at a point remote from the Lidocaine stick. The area where the wrist bends is not a good area because if you flex the wrist too much, it stops the flow of fluids.
Before the current event, she did not know that nerve injury was a risk of venipuncture. She knew there was a risk of hematoma or infection. Many patients express pain after an IV insertion, but she had not been aware that such pain could have been a nerve injury. Although he may have expressed some pain, Mills did not recall Fricke saying that he had a shocking pain or other significant symptoms. If a patient indicated pain out of the ordinary, she would not try to go back to the same spot but would get someone else.
Mr. Gary Gagnard, a registered nurse, testified as an expert in the field of nursing. He opined that a reasonably trained nurse should have been aware of the potential for nerve injury when inserting an IV. The wrist area is one to be avoided if there is other available access because the branches of the radial nerve cluster there and come closer to the surface of the skin. Thus, there is a higher possibility of injury at that site. An attempted insertion of the IV in the area between two tendons was wrong, and one should try the wrist only if there was no other equally available access. One should use the site furthest down the extremity vein, which in most people is the hand. A nurse who was *1221 unaware of the cluster of nerves in the wrist lacks the degree of skill ordinarily possessed by nurses starting IVs and failing to take that into consideration was not reasonable care. Referring to a publication written for nurses, "On The Road To Successful IV Starts," Gagnard read that "veins in all aspects of the wrist shouldn't be used for venipuncture because of their close proximity to nerves. Besides the risk of causing pain, preventing movement at these sites may be impossible increasing the risk of complications." On cross-examination, Gagnard conceded that one of the leading basic nursing textbooks, "Potter and Perry," and the "Handbook of Infusion Therapy" do not caution against using the wrist as a site for venipuncture. Gagnard felt that the wrist should be avoided if possible, although he has used sites very close to the site identified by Fricke. A reasonable nurse should not have gone first to the area where Mills initially attempted the IV. If the nerve had been nicked in the first IV stick, it was not reasonable to attempt a second stick within an inch of that area.
He did not know what the best venous access for Fricke was at the time of the incident. He has had some patients experience electrical pain up the arm even while being careful and exercising the proper standard of care. A nerve injury can occur even when a nurse is doing everything properly. However, if the proper steps are subsequently taken, in his experience, an injury can be prevented.
Dr. Richard Morse was recognized as an expert in pain management, psychiatry, and neurology. Dr. Morse began to treat Fricke in December 2002. He testified that any stimulation of the nerve once a pain circuit begins has an amplifying effect. When there is unusual pain connected with injection, one should pull out and move to a safe distance.
Dr. Mack Thomas, an anesthesiologist, clinical professor of surgery in anesthesiology at LSU, and medical advisor and physician at Kenner Regional Medical Center, was on the Medical Review Panel for the present case. He testified that, at the time the panel rendered its opinion, it had concluded there was a repeated attempt to place the IV in the same area adjacent to the injured nerve after the patient reported paraesthesia. According to Fricke's deposition, which Dr. Thomas read after the panel rendered its opinion, Mills went back into the same area on the attempted second IV. If Fricke testified that the second attempt was in the same area as the first, and if he did not recall whether that second stick caused pain, then Dr. Mack would revert to his original panel opinion. The second stick would have caused additional trauma to the same nerve.
It does not make much difference whether the nurse chooses a site on the wrist or the hand, if they are both adequate access. If there is a good vein in the area of the wrist, it is a good place to start an IV, and Dr. Thomas has never taught that the wrist area should be avoided because of possible nerve injury. Dr. Thomas, in the thousands of IVs that he has started, never looked at a good access site on the wrist and not used it just because of the fear of causing a nerve injury. A nurse or doctor using proper skill and technique can, nevertheless, cause a nerve injury without fault on their part. The panel concluded that the first stick was not performed negligently, and the panel's opinion was based solely on their belief that after the shocking sensation was reported, Mills went back into the same area to attempt the IV.
Kim Fricke, wife of Conran Fricke, testified that, on the day of surgery, her husband became very upset at having been stuck with the IV so many times, and he *1222 was in pain. Mrs. Fricke did not witness the first attempts by Mills but was there when the anesthesiologist made the successful insertion. Afterward, Fricke did not complain about the surgery but was suffering from the IV problems.
The deposition of Dr. David Kline was read into the record. Fricke was referred to Dr. Kline for the post-surgical pain that he continued to have. Dr. Kline performed surgery on Fricke's arm and discovered that one branch of a superficial sensory nerve had pulled away or severed from the main nerve. This branch nerve was removed, and the main radial nerve appeared to be intact. Several years later, when the symptoms persisted, a large part of the main nerve had to be removed. Based on the history given him by Fricke as well as the condition of his arm, Dr. Kline felt that the IV needle struck a nerve and parted a branch. Although there are presently procedures for venipuncture that could help steer a puncture away from the nerves, the technology was not there at the time of the incident. Dr. Kline could not tell if Mills attempted a puncture in the same spot more than once. It is likely the injury occurred on the first attempt.
Dr. Wendy Jamison, a neurologist, was also on the Medical Review Panel, and agreed that the panel reached its original conclusion of negligence based on the assumption of repeated attempts at sticking in the same area after Fricke complained of pain. The panel believed that the first stick started the symptoms and the second must have aggravated it. It is still her opinion that, very likely, if the nurse returned to the same area, the nerve was aggravated. If Fricke felt no pain on the second attempt, it was partially because the nerve had already been traumatized. Dr. Jamison understood that IVs can be started in the wrist area, although if there is adequate access in the hand, it would be better to use that hand with fewer nerves in the area. If a nurse is comparing two sites, she should go to the one least likely to be near a nerve.
Dr. James R. Douglas practices anesthesiology at Ochsner and testified by deposition. Within a month or two of Fricke's carpal tunnel surgery, Dr. Douglas was advised that Fricke was experiencing a nerve problem in his left arm. Dr. Douglas spoke with Fricke and understood that Mills had attempted once to insert the IV in his left hand, that Fricke had some discomfort, and that Mills tried the IV on a second site, which was fine. Mills did not chart either multiple sticks or paraesthesia because it probably did not impress her as being a major issue. A good place to start an IV is the back of the left hand if the right hand is being operated on. Touching a nerve can happen in any area that has some innervation.
Suzanne Riche ("Riche"), a registered nurse, was accepted as an expert in the field of nursing. She testified that, among other things, she taught IV therapy to nursing students and in the military. Riche stated that, in her opinion, Mills met the standard of care for nurses when she started the IV on Mr. Fricke. She demonstrated the proper technique in court. If a nurse examined a hand and determined that the cephalic vein above the wrist area looked more accessible than veins in the hand, it is acceptable to start the IV there. The part of the wrist nearest the hand is not the preferred site because of a nerve cluster around the cephalic vein there and because the wrist there is flexible. A reasonable, competently trained nurse should have known to avoid the wrist and been aware of the potential for nerve injury. However, Riche was not aware of any publication as of 1996 that recommended an IV not be started within four or five inches of the wrist. It was Riche's understanding *1223 that the IV started by Mills' IV was just above the level of the wrist, and she herself has started IVs there. Before coming close to nerve-rich area, Riche would look at whatever sites were available. It is unusual to put Lidocaine as far from the IV entry as Fricke had testified it was done. It is not unusual for a patient to express pain, but a nurse should withdraw the needle if they do. Then the attempt could be made in the same vein, but at least an inch closer to the heart. A nurse, exercising proper technique and skill, can, nevertheless, cause a nerve injury.
On appeal, Fricke asserts that two salient facts, not in dispute, evidence that the jury was manifestly erroneous in failing to conclude that Mills lacked the necessary degree of knowledge or skill ordinarily exercised by a health care provider under the circumstances. The points, according to Fricke, are that Mills was not aware of the potential for nerve injury during an IV insertion and that she was not aware of the increased risk of nerve injury from an IV attempt in the wrist. Combined with testimony that the standard of care required Mills to have this knowledge, Fricke urges manifest error occurred. Fricke asserts that the testimony conclusively shows that Mills went directly to the wrist without attempting or evaluating any other area. Fricke also contends that Ochsner was negligent for failing to competently train its intravenous nurses.
The burden of proof in a malpractice suit is governed LSA-R.S. 9:2794(A). A medical malpractice claimant carries a burden of proof that is two-fold. The plaintiff must establish by a preponderance of the evidence that the treatment was below the standard of care for particular specialties and a causal relationship existed between the alleged negligent treatment and the injury sustained.[1] Whether alleged malpractice constitutes negligence is a question for the jury.[2] In addition, the manifest error rule applies in appeals of medical malpractice actions.[3] It is the jury's duty to assess the testimony and credibility of all witnesses and to make factual determinations regarding these evaluations.[4] In a medical malpractice case, "a reviewing court will give great deference to a jury's findings when medical experts express different views, judgments, and opinions on whether the standard of care was met in any given case."[5]
Expert opinions are necessary sources of proof whose views are persuasive, though not controlling, and any weight assigned to their testimony by the jury is dependent upon the expert's qualifications, experience, and studies upon which his testimony is based.[6] When a factfinder's decision is based on crediting the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.[7]
*1224 After a review of the record, we find that the verdict of the jury is not manifestly erroneous or clearly wrong. Although Mills testified that she was not aware of the potential for nerve damage as a risk of venipuncture, that testimony in and of itself is not a basis for a finding that the procedure was negligently performed. While the evidence did not clearly prove the exact location of the first stick, Mills testified that, in her experience, the area near where the wrist bends is not a good place for IVs, although for reasons other than that it is a nerve-rich location as expressed by Riche. The jury could have reasonably concluded that the first stick was not made at that hand juncture. In addition, all of the experts testified that the wrist area is an acceptable location in which to begin an IV, and several stated they had also started IVs in the wrist. They further agreed that nerve injuries can occur in the absence of negligence. Fricke's expert, Mr. Gagnard, admitted that he has had patients experience nerve pain even while exercising due care. There was no testimony or evidence that it is negligence per se to perform venipuncture in an area where nerves are present. The jury could reasonably have determined that the wrist area is a suitable area in which to start an IV, and that Mills was not negligent in making that decision.
Further, there was a reasonable basis for a determination that Mills did not make the second try in the same spot as the first. Fricke himself wavered and was uncertain as to where the sticks were made, particularly the second attempt, and Mills testified that she would not return to the same area after significant pain is reported. There was no physical evidence on this issue. Although it is apparent that Fricke suffered a nerve injury, there was nothing in the evidence to indicate that the IV was administered improperly. Thus, considering the evidence as a whole, the jury could reasonably conclude that Mills did not lack the requisite knowledge or skill ordinarily exercised by a health care provider administering an IV, or that she failed to use reasonable care along with her best judgment, in applying that skill to Fricke.
For the foregoing reasons, the judgment is affirmed. Costs are assessed to the appellant.
AFFIRMED.
NOTES
[1] Martin v. East Jefferson Gen. Hosp., 582 So.2d 1272, 1276 (La.1991); Burns v. UHS of New Orleans, Inc., XXXX-XXXX (La.App. 4 Cir. 2/19/03), 841 So.2d 51, writ denied, XXXX-XXXX (La.5/9/03), 843 So.2d 408. See also, Beilenson v. Jefferson Parish Hosp. Serv. Dist. No. 2, 04-814 (La.App. 5 Cir. 12/14/04), 891 So.2d 74.
[2] Dutton v. O'Connell 04-1287 (La.App. 5 Cir. 4/26/05), 901 So.2d 602, 606, writ denied, XXXX-XXXX (La.1/9/06), 918 So.2d 1049.
[3] Dutton v. O'Connell, supra (citing Martin v. East Jefferson Gen. Hosp., supra and Alello v. Smith, 94-103 (La.App. 5 Cir.7/26/94), 641 So.2d 664).
[4] Id.
[5] Dutton v. O'Connell, supra, at 606.
[6] Id.
[7] Id.