| xBYRNES, Judge.
Defendants, Dr. Thomas B. Ryan, and the Louisiana Patient’s Compensation Fund and Oversight Board (the “Fund”), appeal a judgment in favor of plaintiff, Kietra L. Jordan, in a medical malpractice action. We reverse.
Having complaints of urinary frequency and a yeast infection, Ms. Jordan was first examined by Dr. Ryan, a gynecologist, in his office on Friday, December 4, 1987. Ms. Jordan informed Dr. Ryan that she had no known allergies, and she requested birth control pills. With a diagnosis indicating a urinary tract infection and a yeast infection, Dr. Ryan prescribed Septra pills and Monistat cream. Dr. Ryan provided Ms. Jordan with a prescription for birth control pills, a one-month sample of birth control pills, and the Septra pills. Ms. Jordan never had taken Septra prior to that date.
On the following day, Saturday, December 5, 1987, Ms. Jordan telephoned Dr. Ryan’s office with complaints of increased genital itching and burning. Dr. Ryan returned Ms. Jordan’s telephone call, instructed Ms. Jordan to continue taking the medication as directed and to call him on Monday, December 7, 1987 if she continued to have any problems. On Monday, December 7, 1987, Ms. ^Jordan’s aunt, Ms. Edna Pierre, contacted Dr. Ryan’s office and put him in touch with Ms. Jordan. At that time, Ms. Jordan informed Dr. Ryan that she was experiencing vaginal genital itching and burning worse than she was previously experiencing and that her “throat was starting to get sore.” Ms. Jordan was not experiencing any itching or burning other than in the vaginal area. Ms. Jordan testified that she wanted an appointment that day, but Dr. Ryan informed her that he was booked and offered her an appointment for the next day, Tuesday, December 8,1987.
Ms. Jordan informed Dr. Ryan that she could not see him on Tuesday, December 8, 1987 because this would interfere with her class schedule at Xavier University. Rather, Ms. Jordan made an appointment to see Dr. Ryan on Wednesday, December 9, 1987. Subsequently, Ms. Jordan attended her classes at Xavier on Monday, December 7, *1032 1987, Tuesday, December 8, 1987, and Wednesday, December 9,1987.
Ms. Jordan testified that when she saw Dr. Ryan on the afternoon of December 9, 1987, she complained of blurred vision, increased genital itching and burning, trouble keeping lipstick on her lips, and a sore throat. She indicated that she thought she was having an allergic reaction to the medication. Ms. Jordan also showed Dr. Ryan splotches on her right arm. At this time, Ms. Jordan’s rash was just starting and had not broken out all over. Ms. Jordan testified that on Dr. Ryan’s instruction to stop taking the Septra, she ceased taking that medication after her December 9, 1987 examination. When Dr. Ryan performed a vaginal examination of Ms. Jordan on December 9, 1987, he noted two ulcerations on the labia. Because of Ms. Jordan’s symptoms of genital burning and itching that had [..¡increased despite medication, and because she was a young woman, herpes was a differential diagnosis on December 9. Dr. Ryan informed Ms. Jordan of this possibility and took a sample for a herpes culture. He also prescribed Corti-caine cream, a combination steroid and topical anesthetic for the lesions and the pain.
On Thursday, December 10,1987, Ms. Jordan applied Benadryl and Calamine lotion to the blotches on her right arm for the first time. Later that evening, the rash on Ms. Jordan’s right arm began to break out all over her body. On the early morning of Friday, December 11,1987, Ms. Jordan went to the Humana Hospital emergency room in New Orleans where she was seen by Dr. Gameel Ghaprial, an emergency room specialist. Although she had informed Dr. Ryan on December 4, 1987 that she had no known allergies, she advised the Humana emergency room personnel that her history included an allergic reaction to Erythromycin. After his examination of Ms. Jordan, Dr. Ghaprial diagnosed her with an urticarial eruption (a hives-like rash). Dr. Ghaprial also diagnosed Ms. Jordan as suffering an allergic reaction. Although Dr. Ghaprial was familiar with Stevens-Johnson syndrome, he did not diagnose Ms. Jordan with Stevens-Johnson syndrome at that time. More specifically, Dr. Ghaprial found no blister-like lesions. Dr. Ghaprial treated Ms. Jordan with a steroid, Amoxicil-lin, and Benadryl. Dr. Ghaprial then instructed Ms. Jordan to contact Dr. Ryan if her condition did not improve within two days. However, Ms. Jordan never attempted to contact Dr. Ryan after either the December 9, 1987 office visit or the December 11, 1987 visit to the Humana Hospital of New Orleans emergency room.
Later that Friday, December 11,1987, Ms. Jordan contacted her mother, and they decided that Ms. Jordan should return home to Augusta, Georgia. Ms. UJordan arrived in Augusta on Saturday, December 12, 1987. By this time, Ms. Jordan’s mobility was restricted. Ms. Jordan’s condition continued to worsen, and she developed a serious and significant outbreak of blisters on her mouth and body. On Sunday, December 13, 1987, four days after her last contact with Dr. Ryan, Ms. Jordan went to the Humana Hospital in Augusta and was diagnosed with Stevens-Johnson Syndrome. Ms. Jordan was hospitalized at Humana in Augusta for three days in intensive care and for a total of sixteen days. By the time of trial she had recovered from the Stevens-Johnson Syndrome.
Dr. Ryan did not chart either his December 5, 1987 or his December 7, 1987 telephone conversations with Ms. Jordan. Additionally, Dr. Ryan did not chart some of the symptomatology which Ms. Jordan had on December 9, 1987 or his instructions to Ms. Jordan to stop taking the Septra medication at that time. Rather, Dr. Ryan testified that he accepts Ms. Jordan’s testimony regarding what symptoms she had on December 9,1987 and regarding his instructions to her to stop taking the Septra during the December 9, 1987 examination of Ms. Jordan.
Ms. Jordan sued Dr. Thomas Ryan, his clinic, and various other health care providers and their insurers for damages allegedly sustained as a result of Dr. Ryan’s medical malpractice in failing to properly diagnose and treat her underlying infection and severe allergic reaction, known as Stevens-Johnson syndrome. By amending and supplemental petitions, additional providers were added, and Jordan’s parents were added as petitioners, asserting claims for loss of consortium. *1033 A medical review panel reviewed Ms. Jordan’s claim pursuant to La. R.S. 40:1299.41 et seq., and rendered a unanimous opinion in favor of Dr. Ryan, finding that the evidence did not support the conclusion that Dr. Ryan failed to |smeet the applicable standard of medical care, and that the conduct of which Ms. Jordan complained was not a factor in the resulting damages.
Following a four day trial, the jury returned a verdict in favor of Ms. Jordan and against Dr. Ryan in the amount of $100,000 and against the Fund in the amount of $400,-000. The trial court entered judgment on the verdict and denied motions filed by Dr. Ryan and the Fund for judgment notwithstanding the verdict, new trial, mistrial and/or remittitur. The appeal of defendants, Dr. Ryan and the Fund, followed.
On appeal Dr. Ryan and the Fund contend that the trial court erred in: (1) finding that Dr. Ryan breached the ordinary medical standard of care in his treatment of Ms. Jordan, and that breach caused the plaintiffs injuries; (2) not finding that the damage award was excessive; and (3) denying the motion for a new trial and/or mistrial.
In a medical malpractice action against a health care provider, the patient must prove by a preponderance of the evidence that: (1) the doctor’s treatment fell below the ordinary standard of care required of physicians in his medical specialty; and (2) that the doctor’s substandard care caused the injury sustained. La. R.S. 9:2794; Byrd v. State Through Depart, of Public Safety and Corrections, 93-2765 (La.5/23/94), 637 So.2d 114. A physician’s duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. The law does not require absolute precision in medical diagnoses; acts of professional judgment are evaluated in terms of reasonableness under the circumstances then existing, not in terms of the result or in light of subsequent events. Soteropulos v. Schmidt, 556 So.2d 276 (La.App. 4 Cir.1990). It is the specialist’s | ¡¡knowledge of the requisite subject matter, rather than the specialty within which the specialist practices, which determines whether a specialist may testify as to the degree of care which should be exercised; a particular specialist’s knowledge of the subject matter on which he is to offer expert testimony is determined on a case by case basis. McLean v. Hunter, 495 So.2d 1298 (La.1986). Causation is a question of fact to which the trial court’s determinations will not be disturbed absent manifest error. Martin v. East Jefferson General Hosp., 582 So.2d 1272, 1276 (La.1991); Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989). Before a fact-finder’s verdict may be reversed, the reviewing court must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State Through Dept, of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314. Although deference is accorded to the factfinder, the reviewing court has a constitutional duty to review facts,[1] not merely to decide whether the reviewing court would have found the facts differently, but to determine whether the trial court’s verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221.
Dr. Ryan relies on the testimony of his expert witnesses, Dr. Lee T. Nesbitt, Jr., and Dr. Larry Millikan, as well as the determination of the medical review panel. Dr. William P. Coleman, III, a board certified dermatologist, who saw the plaintiff at the request of her attorney, also was called as a witness by the defendants.
|7Pr. Nesbitt qualified as an expert concerning Stevens-Johnson Syndrome (the syndrome), having seen over fifty cases during his career and serving as a professor and head of the Dermatology Department at Louisiana State University’s School of Medicine. Dr. Millikan holds similar credentials at Tulane Medical School and has seen about twenty-five cases of the syndrome.
Dr. Maelyn Elliott Wade, a board certified obstetrician/gynecologist, testified on behalf of the plaintiff. The video deposition of Dr. *1034 Robert B. Rhoades, a board certified allergy specialist, who treated Ms. Jordan and has experience treating the syndrome, was offered by the plaintiff and was reviewed by the jury. Additionally, the jury viewed the video deposition of Dr. James J. Wallace, a psychiatrist, who saw the plaintiff six times beginning in September 1988. Dr. Wallace testified on behalf of the plaintiff. He diagnosed Ms. Jordan’s condition as an adjustment disorder with depressed and anxious mood. He felt that her adjustment disorder was fairly severe although he did not see her symptoms as being dramatic enough to support a diagnosis of post-traumatic stress disorder. Dr. Wallace related Ms. Jordan’s adjustment disorder in part resulting from her experience in having Stevens-Johnson syndrome, as well as resulting from other family stresses and incidents in her life.
Except for Dr. Wallace, who did not testify as an expert concerning the symptoms of the Stevens-Johnson syndrome, all of the physicians, including Dr. Ryan and the members of the medical review panel, composed of three obstetrician/gynecologists, Dr. Eugene J. Hoffman, Dr. Gustavo F. Carlomagno and Dr. George B. Morris, III, as well as Dr. Wade and Dr. Rhoades, agreed that the syndrome is extremely rare.
|gDr. Nesbitt testified that the syndrome will occur with as few as one or two doses of the allergen and is not dose-related. Dr. Rhoades agreed that only a few doses of an allergen drug will induce the syndrome in a sensitive patient. Dr. Millikan, however, testified on cross-examination that he could not determine which dose, the first, second, fifth or tenth was the one that triggered Ms. Jordan’s serious allergic reaction. The doctors agreed.that stopping the drug after its introduction would have no effect on whether the patient develops the syndrome.
Dr. Rhoades and Dr. Millikan testified that the syndrome’s reaction usually begins about seven days after introduction of the allergen drug. Doctors Rhoades and Nesbitt testified to the difficulties encountered in diagnosing the syndrome, and Dr. Rhoades noted that the disease becomes full-blown relatively quickly, usually in one or two days. Dr. Nesbitt testified that the syndrome could not be diagnosed positively until the outbreak of symmetrical blistering in the mouth and on the skin, and in his mind, there was no evidence that Ms. Jordan was having the syndrome even as late as her emergency room visit in the early hours of Friday morning.
• As to treatment, Dr. Rhoades testified that he uses steroids to treat the syndrome, although there is not conclusive evidence that they are helpful.
As to causation, Dr. Millikan testified that he had reviewed the records in this case, and felt there was a 60 percent probability that the syndrome had been induced by the Sep-tra, 20 percent probability that it had been induced by the Amoxicillin, and 20 percent probability that it had been induced by herpes virus. Dr. Nesbitt testified that the Septra may have caused the syndrome in Ms. Jordan, but it could have been caused by an infection or by other medication.
I s)Dr. Wade testified that the Septra caused the syndrome.
Dr. Coleman testified that Septra could have caused the syndrome, which could also have been caused by the herpes or an unknown infection. He said that more likely than not, however, the Septra was the cause of the syndrome in Ms. Jordan’s case.
In Dr. Nesbitt’s opinion, even if the Septra was the cause of Ms. Jordan’s Stevens-Johnson syndrome, stopping the Septra dosages would not have made any difference in stopping the onset of the syndrome’s symptoms and the reaction would have been the same whether or not the dosage was stopped on December 7 or December 9, 1987. Dr. Nes-bitt explained that if a patient took the medication Septra for the first time, it would take an incubation period of seven to ten days for a reaction to occur. If the patient previously took the medication Septra within two or three years, the reaction could probably be manifested in 36 to 48 hours. Plaintiffs expert, Dr. Wade, testified that Septra was a highly used medication for the treatment of urinary infections, and he saw nothing wrong with Dr. Ryan’s having prescribed it initially for Ms. Jordan.
*1035 Assuming that the Septra was the cause of Ms. Jordan’s Stevens-Johnson syndrome, the issue is whether Dr. Ryan’s actions constitute deviations from the medical standard of care in the community when he: (1) delayed in advising the plaintiff to stop taking the medication at the onset of her first symptoms of increased itching and burning, and sore throat; (2) failed to see the patient immediately or to arrange for an appointment so that another physician could examine her on Monday, December 7, 1987; and (3) failed to diagnose the plaintiffs condition as an allergic reaction on December 9, 1987.
lioOn December 5, 1987, the day after she began taking Septra, Ms. Jordan called Dr. Ryan, complaining again of burning and itching. He continued her on the Septra and told her to call him back on December 7, 1987. On Monday, December 7, she called again to advise Dr. Ryan that the itching and burning had become worse, her throat was sore, and she wanted to see him that day. Dr. Ryan offered her an appointment on the December 8, which was not convenient, so she did not see him until December 9, 1987.
When the patient called to schedule an appointment, and Dr. Ryan’s schedule was full for Monday, December 7, 1987, the patient could not come into the office on Tuesday because of her college schedule. The fact that the patient wanted to put off treatment for another additional day would indicate to a physician that the plaintiffs condition did not need immediate attention. Ms. Jordan informed Dr. Ryan that she had no known allergies. Without the information that the patient’s history showed a prior allergic reaction, and with a reasonable conclusion that the patient’s condition did not warrant immediate attention, Dr. Ryan did not deviate from the medical standard of care when he did not have another physician see the plaintiff on Monday, December 7, 1987 and did not instruct Ms. Jordan to stop taking the Septra on that date. Even if Ms. Jordan had been examined by Dr. Ryan or another physician on December 7, 1987, a failure to diagnose her symptoms would not have constituted a deviation from the ordinary standard of medical care because the syndrome was rare, was not easily diagnosed, and would have occurred even if the Septra dosage was discontinued on December 7, 1987. Dr. Ryan’s treatment remained within the ordinary Instandard of care in his specialty when he told the patient to stop taking the medication, Septra, when he saw her on December 9,1987.
A possible diagnosis of herpes was reasonable at that time based on Dr. Ryan’s examination and his finding two lesions in the patient’s vaginal area. There was testimony that herpes can cause problems with urinating, which was one of Ms. Jordan’s continued symptoms. The plaintiff testified that she told Dr. Ryan that she “had not had sex in about three months.” The patient requested birth control pills. It would not be unusual for a gynecologist to see a patient with herpes; a possible diagnosis of herpes rather than an allergic reaction was not unreasonable where the patient’s history included the above factors but did not include any known allergies. Dr. Ryan’s treatment remained within the ordinary standard of care in his specialty.
Dr. Ryan did not diagnose Ms. Jordan with the Stevens-Johnson syndrome; however, Dr. Gameel Ghaprial, the Humana emergency room specialist, did not make that diagnosis either although he was familiar with that rare condition, he was aware that Ms. Jordan had an allergic reaction to Erythromycin, and he examined Ms. Jordan later than Dr. Ryan. Nor did Dr. Ghaprial admit Ms. Jordan into the hospital after he examined her in the emergency room. Under the totality of circumstances the plaintiff failed to show by a preponderance of the evidence that Dr. Ryan’s treatment was below the medical standard of care required of doctors in his medical specialty in the community, and the trial court’s finding that the defendants were liable was manifestly erroneous. A physician’s conduct in treatment of a patient is evaluated in terms of professional standards and the current state of medical science, and a physician’s judgment is evaluated in | flight of the facts known at the time of the patient’s treatment, not on the basis of hindsight of information later learned. Alello v. Smith, 94-103 (La.App. 5 Cir. 7/26/94), 641 So.2d *1036 664, writ denied 94-2231 (La.11/18/94), 646 So.2d 382.
The conclusion that the trial court was clearly wrong in finding liability on the part of Dr. Ryan and the Fund, pretermits a review of the other claims raised on appeal.
Accordingly, the judgment of the trial court is reversed, and the suit against the defendants, Dr. Ryan and the Fund, is dismissed.

REVERSED & RENDERED.

ARMSTRONG and MURRAY, JJ., concur with reasons.
WALTZER, J., dissents with reasons.

. See, LSA-Const. Art. 5, section 10(B).