| MOAN BERNARD ARMSTRONG, Chief Judge.
The surviving brothers and sisters of David M. Jones, who died in March of 1998, brought this medical malpractice case against Doctors John Bick, Ricardo Febry, Nancy Lehman, Hope Cromer, Malcolm Andry and Christine Smith. The plaintiffs claimed that David Jones’ death was caused by the appellants’ negligent treatment and inappropriate administration of the drug, Clozaril. Doctors Febry and Andry filed their answer, noting that the plaintiffs’ complaint was presented to a statutory medical review panel that concluded that the doctors complied with acceptable standards of care, and pleading the statutory maximum recovery of $100,000 should plaintiffs prove liability. Doctors Bick, Lehman, Cromer and Smith, and the State of Louisiana[1], filed answer claiming the benefit of the provisions of the Louisiana State Employees Medical Malpractice Act, LSA-R.S.40:1299.39 et seq. (The Public Act).
12Doctors Cromer and Smith filed a motion for summary judgment that the trial court denied on September 5, 2003.
The case was tried on the merits to the trial judge on September 15, 16 and 17, 2003. On November 10, 2003, the trial court rendered a final, second amended judgment against Dr. Bick, awarding each plaintiff $50,000 in general damages; awarding plaintiff Ruby Jones $4,264.00 for funeral expenses; dismissing with prejudice the plaintiffs’ survival action on behalf of David Jones; dismissing plaintiffs’ wrongful death and survival actions against Doctors Febry, Andry, Lehman, Cromer and Smith; and casting Dr. Bick in judgment for court costs, expert witness fees and judicial interest from the date of demand until paid. _ Plaintiffs did not appeal the judgment, but filed an answer to the appeal claiming that Doctors Cromer and Smith were hable with Dr. Bick and the State.[2] The State of Louisiana, Louisiana State University Health Sciences Center (the State) and Dr. Bick, and the plaintiffs filed motions for new trial that the trial court denied on January 15, 2004, and the State and Dr. Bick subsequently filed this appeal. For the reasons that follow we amend the judgment to remove the name of Dr. John Bick and, as amended, affirm the judgment of the trial court.
During the late 1980s, Mr. Jones experienced auditory and visual hallucinations. He reported to his doctors that he heard voices and had visions of a “hit man” and a man dressed in an Army uniform. In 1990, at the age of thirty, Mr. Jones was diagnosed with severe chronic paranoid *740 schizophrenia. Ih 1996, |3while being treated as an outpatient at Chartres Mental Health, his sister, Ruby Jones, transferred his care to Dr. Smith in the Touro Infirmary Partial Hospitalization Program (PHP). Under this program, Mr. Jones would attend the psychiatric treatment facility daily from 9:00 a.m. until 3:00 p.m., whereupon he would return home.
From 1990 to 1997, he was treated with a variety of anti-psychotic medications, including Haldol, Novane, Risper-dal, and Zyprexa. The litigants agree that these drugs produced only mild or sporadic relief from Mr. Jones’ severe psychotic episodes. In the fall of 1997, Dr. Smith observed the lack of relief provided by Zyprexa, and recommended to Mr. Jones and to his sister, Ruby Jones, that Mr. Jones should begin a trial of Clozaril. The communication of this recommendation to Ruby Jones was consistent with her active participation in her brother’s care. His doctors considered Ms. Jones an integral part of her brother’s care and support system during the time he was a psychiatric outpatient. The expert testimony indicates that Clo-zaril is a powerful drug, with dangerous side effects, and can be considered a drug of last resort.
In early February, 1998, Dr. Smith prescribed 12.5 mg of Clozaril each day. The dosage was to increase gradually (“ti-trate”) over a six-week period to the level of 150 mg per day. According to the 1998 edition of the Physicians’ Desk Reference, a joint exhibit, this was slower than the manufacturer’s recommended rate of increase in dosage. The Touro Infirmary Pharmacy issued Mr. Jones’ first Clozaril prescription on February 6, 2004.
[4At the same time, Mr. Jones complained of back pain and was diagnosed with hypertension. The record shows that Mr. Jones was referred to internist Dr. Ricardo Febry and presented with a family history of heart attacks and strokes. Furthermore, Mr. Jones was overweight, smoked, complained of back pain and had high cholesterol. Dr. Febry began treating Mr. Jones’ hypertension and performed a cardiac workup in connection with the February, 1998 referral. An echocardio-gram demonstrated that over a six-month period Mr. Jones’ heart became enlarged because of his chronic high blood pressure. Dr. Febry’s initial patient assessment noted that this hypertension was causing damage to the heart requiring intervention and treatment.
In early March, 1998, the PHP staff noticed that despite having been on Clo-zaril for nearly a month, Mr. Jones was still highly psychotic, with possible suicidal ideations. On March 12, 1998, he was admitted as an in-patient to Touro’s psychiatric unit, where Dr. Bick supervised his psychiatric care. The purpose of the admission was to place Mr. Jones in a controlled environment where his medication could be increased to a therapeutic level of between 400 and 900 mg of Clozar-il per day without the risk of Mr. Jones harming himself or others.
The hospital record shows that on March 12 and 13, he was extremely hypertensive, and the psychiatry service referred him for an internal medicine consult to address the back pain and high blood pressure findings. Dr. Febry continued his treatment in response to the consult. Dr. Febry added Procardia to the Norvase and Lotensin Mr. Jones was taking for hypertension. These | ¿medications are members of the class of benzodiazepines, which can interact adversely with Clozaril to cause, among other side effects, sudden death. During this hospitalization, Mr. Jones experienced several of the known adverse side effects to Clozaril, those being drowsiness, weakness, incontinence, *741 slurred speech, depression, hypertension, hypotension, hypersalivation, back pain and altered states of consciousness.
On the evening of March 13, a Touro nurse called Dr. Febry to report that Mr. Jones’ lethargy and slurred speech could be associated with an evening dosage of Clozaril. Dr. Febry testified that this medication was within Dr. Bick’s area of expertise, but said he began at that time to question the relationship between Mr. Jones’ symptoms and his taking Clozaril. He ordered discontinuation of the Clozaril and prescribed Benadryl to address Mr. Jones’ slurred speech. At 10:45 that evening, Mr. Jones reportedly became weak and fell on his way to the bathroom.
The next morning, Dr. Febry, Dr. Bick and psychiatric resident Dr. Lehman met, whereupon Dr. Febry deferred to Dr. Bick’s decision to reinstate the Clozaril, reasoning that a psychiatrist is responsible for knowing the medications he prescribes.' The doctors decided, on Dr. Bick’s recommendation, to continue Mr. Jones’ Clozaril and to increase the dosage to a therapeutic range. Mr. Jones received Clozaril at 1:30 and 100 mg, 50 mg less than his pre-hospitalization dosage level, at 5:00 p.m. The evening of March 14 passed without further incident.
|fiOn March 15, Mr. Jones ate breakfast and took his morning medications, including a 100 mg dose of Clozaril, without reported difficulty. The hospital record indicates that his vital signs, including blood pressure and pulse, were normal following administration of this dose of Clozaril. The vital signs were taken with Mr. Jones lying down and sitting up. Mr. Jones was then seated in a geri-chair that has straps to hold patients in an upright and seated position for their protection and was taken to the day room. The use of such a seat is consistent with the events of March 13th. At noon, his vital signs continued to be within normal limits. According to the nurse’s notes, at about 1:30, Mr. Jones refused lunch and the nurse rolled him from the day room to the nurse’s station. Six minutes later, he was slumped over in the chair with evidence of hypersalivation, and the nurse called a code, beginning emergency efforts to resuscitate Mr. Jones. These attempts were unsuccessful, and Mr. Jones was pronounced dead.
The Orleans Parish Coroner’s Office performed an autopsy finding the primary cause of death to have been an enlarged heart and extensive atherosclerosis.
In order to prevail in this suit, the plaintiffs must prove by a preponderance of the evidence the following:
1. The standard of care applicable to Mr. Jones’ medical treatment, that is, the degree of knowledge or skill required by doctors in Dr. Bick’s practice area in the greater New Orleans area. La.R.S. 9:2794(A)(1);
|72. That Dr. Bick’s actions deviated from that standard of care. La.R.S. 9:2794(A)(2); and
3. That Dr. Bick’s deviation from the standard of care was the proximate cause of Mr. Jones’ death. La.R.S. 9:2794(A)(3).
The law does not require absolute precision in medical diagnoses, but evaluates acts of professional judgment in terms of reasonableness under the circumstances then existing, not in terms of the result or in light of subsequent events. Jordan v. Ryan, 95-2259, p. 6 (La.App. 4 Cir. 11/27/96), 684 So.2d 1030, 1033, citing Soteropulos v. Schmidt, 556 So.2d 276 (La.App. 4 Cir.1990).
In determining whether the trial court’s finding that the evidence offered by the plaintiffs met this standard, our inquiry is whether the trial court’s findings *742 were manifestly erroneous/clearly wrong. Determinations of the requisite level of skill required, whether there has been a breach, and causation are findings of fact and should be reversed only upon a finding of manifest error. The appellate court may reverse only if (1) the record reflects no reasonable factual basis for the trial court’s finding, and (2) the record establishes that the finding is clearly wrong. Serigne v. Ivker, 2000-0758, p. 5 (La.App. 4 Cir. 1/23/02), 808 So.2d 783, 787; Giammanchere v. Ernst, 96-2458, pp. 4-5 (La.App. 4 Cir. 5/19/99), 742 So.2d 572, 575.
The State and Dr. Bick argue on appeal that the trial court impermissibly applied “hindsight” in holding Dr. Bick accountable for Mr. Jones’ death, and that Dr. Bick’s actions were well within the standard of care. The plaintiffs contend | Rthat the judgment was not based upon hindsight, but upon Dr. Bick’s disregard of evidence that Mr. Jones was non-compliant with the instructions for administration of Clozaril because of his pre-admission behavior and symptoms of Clozaril overdose manifested during Mr. Jones’ final hospital stay.
The appellants rely on the Louisiana Supreme Court’s holding that the test of foreseeability in the sense of hindsight, not foresight, is inappropriate in determining causation when a doctor has been guilty only of ordinary negligence in a medical malpractice case. The Supreme Court noted that if the trier of fact is required to attribute the knowledge of hindsight to the practitioner, the doctor may be held unfairly to a standard of knowledge or information impossible in daily practice and attainable only by the research scientist or the analytical pathologist looking backward reflectively at the particular case. Pitre v. Opelousas General Hosp., 530 So.2d 1151, 1161 (La.1988). The “hindsight” referred to in Pitre concerned the liability of a practitioner for consequences not foreseeable at the time of treatment. The Supreme Court held that a physician is liable for all resulting harm to the person caused by a negligent physical impact upon the person of the plaintiff, but not for those consequences that no reasonable practitioner would expect to follow from the conduct. However, the court made clear that a physician who intentionally, recklessly or in bad faith violates his legal duty shall be Hable for all damages, foreseeable or not, that are a direct consequence of his breach of obligation.
| gSimilarly, we held that a physician’s conduct in the treatment of a patient is evaluated in terms of professional standards and the current state of medical science, and a physician’s judgment is evaluated in light of the facts known at the time of the patient’s treatment, not on the basis of hindsight or information later learned. Jordan v. Ryan, supra at pp. 11-12, 684 So.2d at 1035, citing Alello v. Smith, 94-103 (La.App. 5 Cir. 7/26/94), 641 So.2d 664.
Dr. Bick and the State argue that Dr. Bick could not reasonably have known of the presence of pill bottles containing unused Clozaril allegedly discovered by Ruby Jones in a closet in her house over five years after Mr. Jones’ death, nor could Dr. Bick have known that Mr. Jones would die of a heart attack.
Pretermitting the issue of the admissibility of the pill bottles, which is the subject of another assignment of error herein, we must determine if Mr. Jones’ cardiac failure was a consequence that Dr. Bick reasonably should have anticipated could result from the administration of Clozaril to this particular patient under the particular circumstances of this case. Under the Pitre rationale, the issue becomes whether Mr. Jones’ reaction to the Clozaril was foreseeable to Dr. Bick at the time the *743 decision was made on March 14 to administer Clozaril. Clearly, knowledge obtained upon the discovery of the pill bottles more than five years after Mr. Jones’ death is not relevant to that determination.
The plaintiffs contend, however, that even absent the evidence of the pill bottles, Dr. Bick was presented with evidence of Mr. Jones’ non-compliance with the doctor’s direction that he take 150 mg of Clozaril daily prior to his final 1 mhospitalization well before his decision to administer Clozaril to Mr. Jones on March 14 and 15. The reasonableness of Dr. Bick’s conduct is measured against what he knew or reasonably should have known of Mr. Jones’ condition, including his compliance with medical instructions, and what he knew or should have known of the properties of Clozaril.
The Medical Review Panel concluded, inter alia, that the evidence did not support the conclusion that Doctors Bick, Cromer and Smith failed to meet the applicable standard of care. The Panel gave the following reasons for their conclusion:
(1) The doctors made the proper referral to the specialist to follow the patient; the appropriate diagnostic tests were performed and the appropriate medications were administered;
(2) Clozaril was not a counter-indicated drug for this patient.
(3) The dosage was proper.
Dr. Kenneth B. Sumner, a member of the Medical Review Panel, testified at trial and identified the Panel’s opinion. On cross-examination, he testified that the panel was told that a family member assisted Mr. Jones by making sure he took his medication every day. The issue of whether Mr. Jones was compliant, that is, as to whether he had taken the prescribed doses of Clozaril prior to his final hospitalization, is crucial in this case. Dr. Bick testified that he was aware of the importance of gradual dosage of this drug, and admitted that if Mr. Jones had not been compliant prior to his final hospitalization in taking the prescribed doses of _JjjClozaril, Mr. Jones should have been given no more than 12.5 mg twice a day when he entered the hospital. •
Dr. Bick testified that he took responsibility for .the actions of the psychiatry residents who were treating Mr. Jones. When asked if he knew personally whether or not Mr. Jones had been compliant in taking the prescribed dosage of Clozaril prior to his final hospitalization, and whether he did anything personally to determine whether Mr. Jones had been compliant, Dr. Bick replied, “No, sir, but if you want to go that route, no physician has personal knowledge of any patient’s, out-patient’s compliance for any medication, and there was every reason to think that he was compliant.” Counsel then asked Dr. Bick if Mr. Jones would have been a good source of information as to his compliance, Dr. Bick testified, “Not by himself. With someone as ill as Mr. Jones was, family support would be very important.” However, Dr. Bick admitted that he did not ask Mr. Jones or any of his family members about his compliance with instructions concerning taking Clozaril. Dr. Bick relied on notes in the PHP record dated March 2, 4 and 9 saying the patient was compliant with medication; however, he admitted that this information would have come from Mr. Jones’ own comments to his social worker, a source Dr. Bick testified was not reliable. Defense counsel pointed out a PHP note from seven months prior to the final hospitalization showing that Ruby Jones “believed” her brother was taking his medication.
Dr. Bick admitted that he had no personal knowledge as to whether Ruby Jones expressed an opinion on the subject of her *744 brother’s compliance. When |12asked the direct question, “You didn’t make any inquiries” as to compliance, Dr. Bick replied, “That is true, and in my role in the normal course of things, I would not do so.” Dr. Bick relied on the PHP record indicating the family was involved with Mr. Jones and that medication issues were consistently addressed.
The defense expert psychiatrist, Dr. Jose Maldonado, confirmed that the PDR requires administration of no more than 12.5 mg of Clozaril twice daily if the patient had missed as few as two days of Clozaril.
Dr. William Fann, plaintiffs’ expert psychiatrist, testified that it was inappropriate for Dr. Bick to assume that Mr. Jones had been compliant as an outpatient, and that it was inappropriate for Dr. Bick to rely upon a social worker’s assessment of compliance. In Dr. Fann’s opinion, Dr. Bick should have required that the Clozaril prescription bottles be produced at the time Mr. Jones was admitted to the hospital. If the bottles were unavailable or if Dr. Bick otherwise did not require their production, he should have started Mr. Jones at the lowest level, 12.5 mg twice a day, and titrated him up from that point.
Viewing this evidence under the manifest error standard of review, we find that there is credible evidence of record that Dr. Bick did not act reasonably to ascertain whether Mr. Jones in fact was compliant in the taking of Clozaril immediately prior to his final hospitalization.
The State and Dr. Bick argue that the trial court erred in holding that Clo-zaril was unreasonably dangerous for Mr. Jones. They contend that because of 11sMr. Jones’ severe chronic schizophrenia and failure to respond to lesser drugs, Clozaril was the only alternative available short of institutionalization.
The parties jointly introduced the 1998 Physicians’ Desk Reference (PDR) entry concerning Clozaril. According to the PDR, the drug is indicated for the management of severely ill schizophrenic patients who fail to respond adequately to standard antipsychotic treatment. It should be used only in patients who have failed to respond adequately to treatment with appropriate courses of standard anti-psychotic drugs, either because of insufficient effectiveness or the inability to achieve an effective dose due to intolerable adverse side effects. Dr. Bick testified that Mr. Jones fit that definition. However, the inquiry does not end at this point. Although Mr. Jones’ failure adequately to respond to the lesser drugs establishes a basis for considering Clozaril, a reasonable physician would weigh the risk of the drug’s known side effects in light of Mr. Jones’ particular medical and family histories against the drug’s benefits.
As to whether Clozaril is a dangerous drug, Dr. Bick testified on cross-examination that “it’s a drug that has real dangers attached to it.” He testified that Mr. Jones “needed to be on Clozaril, I think it was clear, in spite of the fact there were real risks. Risks of sudden death, agranu-locytosis, depression of white blood cells, and risk of seizures.” Dr. Bick felt that the drug could, “in the right patient ... make a crucial difference in the patient’s quality of life and can save them from horrible, chronic, severe psychosis.”
114Mr. Jones’ medical history was replete with warning signs relating to the likelihood of heart disease. His high cholesterol level, hypertension, smoking habit and family history of seizures and heart attacks would be sufficient to put a reasonable physician on notice that Mr. Jones presented with existing physical problems that required the exercise of prudence in considering the type and level of medi *745 cation to be prescribed. Dr. Febry testified that Mr. Jones was at high risk for cardiac arrest even without the administration of Clozaril. Dr. Febry’s medical assessment, including this history information, was available to Dr. Bick in Mr. Jones’ hospital chart. Dr. Febry testified that he mentioned his concerns to Dr. Bick during their conference on the morning of March 14th, but that he deferred to Dr. Bick’s years of experience and purported knowledge concerning Clozaril. Dr. William Steinman, the appellants’ expert in internal medicine, opined that the standard of care is for each doctor to be responsible for managing the care in his own specialty. We conclude that it is reasonable to require Dr. Bick to be aware of Clozaril’s adverse drug interactions and side effects. Plaintiffs’ expert in the field of internal medicine, Dr. David Hyman, testified that among the dangers associated with Clozar-il is its known interaction with a class of drugs known as benzodiazepines. The anti-hypertension medication given to Mr. Jones belonged to this class of drugs. Dr. Hyman referred to the “black box” information contained in the PDR reference concerning Clozaril. The “black box” contained a warning concerning the interaction between Ativan, a drug that Mr. Jones was | ^taking at the time of his final hospitalization, and Clozaril, and noted that this interaction could cause a sudden heart attack. The warning included the statement:
In one report, initial doses as low as 12.5 milligrams were associated with collapse and respiratory arrest. When restarting patients who have had even a brief interval off Clozaril (Clozapine), i.e. two days or more since the last dose, it is recommended that treatment be reinitiated with one-half of a twenty-five milligram tablet once or twice daily. Some of the cases of collapse/respiratory arrest/cardiac arrest during initial treatment occurred in patients who were being administered benzodiazepines; similar events have been reported in patients taking other psychotropic drugs or even Clozaril (Clozapine) by itself. Although it has not been established that there is an interaction between Clozaril (Clozapine) and benzodiazepines or other psychotropics, caution is advised when Cloza-pine is initiated in patients taking a benzodiazepine or any other psychotropic drug.
Dr. Hyman opined that the combination of Ativan and Clozaril should be monitored very carefully. Dr. Hyman’s opinion was that the internal medicine specialists violated the applicable standard of care in having failed to be aware of the potentially serious drug reactions. Dr. Hyman also noted that on his final admission, Mr. Jones’ diastolic blood pressure was abnormally low, another warning sign, since one of the adverse side effects of Clozaril was hypotension. It appeared to Dr. Hyman that this finding of hypotension led to Dr. Febry’s having taken Mr. Jones off the Clozaril on the 13th and morning of the 14th of March. It was Dr. Hyman’s opinion that this hypotension set off a chain of events leading to Mr. Jones’ sudden cardiac arrest the afternoon of March 15th. It was Dr. Bick who essentially overruled Dr. Febry and recommenced administration of Clozaril to Mr. Jones the day before Mr. Jones died.
Plaintiffs’ expert psychiatrist, Dr. Fann, discussed the fact that Mr. Jones’ smoking history would also adversely affect his reaction to Clozaril. Nicotine h ¿withdrawal caused by the removal of cigarettes in the hospital would cause the Clozaril to metabolize more slowly, thus increasing the Clo-razil level in Mr. Jones’ blood. He opined that it was inappropriate for Dr. Bick to have failed to note the adverse health ef *746 fects experienced by Mr. Jones as signs of Clozaril overdose: weakness, slurred speech, depression, hypotension, incontinence, hypersalivation and back pain. These phenomena, observed on Mr. Jones chart, worsened during his final hospital stay and should have alerted Dr. Bick to the likelihood that Mr. Jones was experiencing a Clozaril overdose, for whatever reason. He opined that had the March 15th dose not been given to Mr. Jones, he would have survived. He also testified that Dr. Bick was obliged to know the pharmacology of the drug he prescribed.
We find that there is credible evidence of record to support the trial court’s finding of failure to meet the standard of care arising from Dr. Bick’s having neglected to consider the warnings contained in the PDR entry concerning Clozaril in light of Mr. Jones’ medical and family histories and hypotension finding upon his final hospitalization.
The State and Dr. Bick argue that the trial court erred in admitting medication bottles presented the day of trial, without proper foundation and authentication. However, in light of our- disposition of the appellants’ first assignment of error, this assignment of error is moot.
The State and Dr. Bick contend that the trial court did not give proper weight to the uncontroverted expert testimony of their pathologist, Dr. Travis Harrison. According to Dr. Harrison, accepted by the trial court as an expert pathologist, Mr. Jones’ death was not caused by a Clozaril-induced sudden drop in blood pressure, but by underlying heart-related conditions. According to Dr. |17Harrison, Mr. Jones died as a result of his severe coronary atherosclerosis (hardening of the heart’s arteries), and a dilated (enlarged) and hypertrophic heart, which made his heart more prone to sudden disruption of the conducting system and to sudden death. Dr. Harrison also related Mr. Jones’ death to his strong family history of heart attack, his high cholesterol and his overweight. Dr. Harrison opined that Mr. Jones’ death was a sudden, unforeseeable event, and more probably than not, Clozaril had nothing to do with his demise.
The appellants refer us to decisions of the Third and Fifth Circuit Courts of Appeal holding that while uncontradicted expert testimony is not binding on the trier of fact, uncontradicted expert testimony should be accepted as true in the absence of circumstances in the record that cast suspicion on the reliability of the testimony. See, Arnold v. Town of Ball, 94-972, p. 8 (La.App. 3 Cir. 2/1/95), 651 So.2d 313, 319; In re Succession of Lovoi, 2000-1391 p. 5 (La.App. 5 Cir. 12/27/2000), 777 So.2d 627, 630. While the foregoing is a correct statement of the opinions of those circuit courts, it is important to view this language contextually in order to apply the principle to the facts of the instant case.
In Arnold, an eminent domain case, the court examined a claim of inverse condemnation and the elements of proof required, one of which was damage to the subject property. Both plaintiffs’ expert appraisers unequivocally testified that the defendant Town’s action in cutting trees on plaintiffs’ property diminished property values. The Town offered no contrary expert testimony, and the trial court found plaintiffs failed to prove diminution of value. The appellate court 11Rfound this judgment to have been clearly wrong, but relied only in part on the cited statement. The court noted:
A trial court’s decision to accept or to reject the testimony of an expert witness will not be disturbed by a reviewing court in the absence of manifest error. Nevertheless, the Louisiana Supreme Court has held that the manifest error *747 standard of review does not require an appellate court “to affirm the trier of fact’s refusal to accept as credible un-' contradicted testimony or greatly preponderant objectively-corroborated testimony where the record indicates no sound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles.” Thus, while uncontradicted expert testimony is not binding on the trier of fact, uncontradicted expert testimony should be accepted as true in the absence of circumstances in the record that case suspicion on the reliability of the testimony. [Citations omitted.]
In Arnold, the court analogized the expert testimony to the lay witness testimony offered in West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1147 (La.1979), where the Louisiana Supreme Court held that in evaluating evidence, the trier of fact should accept as true the uncontradicted testimony of a witness, even though the witness is a party, at least in the absence of circumstances in the record casting suspicion on the reliability of this testimony. The objective evidence offered by the Arnold plaintiffs, consisting of aerial photographs and videotapes, not only “did not cast suspicion” on plaintiffs’ experts, it actually and graphically corroborated their opinion of damage to plaintiffs’ property.
The caveat requiring consideration of the record as a whole led to rejection of uncontroverted expert evidence in the Lo-voi ease. The issue in that case was the authenticity of decedent’s purported will, and the signature on the will was compared to other signatures of the decedent on other documents. The only expert testified that the will and one of the supporting documents, an Army form, had |19been written by two different writers. While recognizing the principle cited by appellants, the court held:
In the present case, there are indeed circumstances that cast suspicion on the opinion of the expert. By her own admission the expert could only say that there was a lot of evidence that pointed to different authorship, but the age of the Army document signatures was a problem. It was also shown that the comparison was made for the most part between print and script. On the other hand, testimony was heard from two witnesses who said they saw the dece-, dent write and sign the document, which they then both signed. Obviously, the trier of fact found these two witnesses credible and also found that the expert’s opinion was not sufficiently weighty to overcome that , credibility. Because these findings are reasonable in light of the entire record, they are not manifestly erroneous and will not be disturbed by this court.
Lovoi, at p. 5, 777 So.2d at 630.
Glearly, these cases read together with the Supreme Court’s pronouncements on manifest error require us to consider Dr. Harrison’s testimony together with that of the other expert and lay witnesses to determine whether the trial court’s finding concerning the proximate cause of Mr. Jones’ death was reasonable. While Dr. Harrison was,the only pathologist who testified, the record contains expert testimony from other medical specialists that attributes Mr. Jones’ demise to administration of the 150mg/day dosage of 'Clozaril ordered by Dr. Bick. In fact, Dr. Harrison’s reference to Mr. Jones’ heart condition and family history, rather than exonerating Dr. Bick from responsibility, served as warning signals that would have alerted a reasonably skillful psychiatrist to ■ inquire further into whether or not Mr. Jones had been taking Clozaril as prescribed prior to his final hospitalization and whether or not *748 the drug was appropriate to a person with his medical history.
This is a classic ease wherein one set of experts attribute Mr. Jones death to sudden cardiac arrest brought about by Clo-zaril overdose and another expert | ¡^attributes the demise to an unforeseeable cardiac incident brought about by genetic and lifestyle factors. Under our manifest error standard of review, it is the trier of fact who has the discretion to choose between these two views of the evidence. Stobart v. State through Dep’t of Transp. and Development, 617 So.2d 880, 883 (La.1993).
Appellants suggest in their reply brief that the trial court’s judgment should be amended to exclude Dr. Bick, citing Detillier v. Kenner Regional Medical Center, 2003-3259 (La.7/6/04), 877 So.2d 100. The Louisiana Supreme Court granted writs in that case “to consider whether state health care providers may be named as individual appellants in a medical malpractice suit under the provisions of the Public Act [La.R.S. 40:1299.39 et seq.].” The court found the language of the public act to be “ambiguous or non-existent” on the point, and undertook an exhaustive review of the legislation in order to determine the legislative intent. The Court held that a plaintiff may name an individual state health care provider covered under the Public Act as a defendant in a medical malpractice lawsuit, insofar as the plaintiff will be able to treat the covered state health care provider as a party, instead of a witness, and will enjoy the corresponding discovery and evidentiary benefits of this distinction. Detillier at pp. 13-14, 877 So.2d at 109-110. However, in a medical malpractice suit brought against the state and a qualified state health care provider, if the court finds that the state health care provider committed medical malpractice, judgment must be entered for the successful claimant against the state alone. Detillier at p. 16, 877 So.2d at 111. It is clear that under the Louisiana Supreme Court’s interpretation of the Public Act under which the instant litigation was brought against Dr. Bick, the judgment of the trial court should be amended to remove his name from the judgment.
|aiFor the foregoing reasons, we conclude that the judgment of the trial court is not manifestly erroneous, but is supported by the evidence of record and represents reasonable credibility choices by the trier of fact. The judgment is amended to delete the name of Dr. John Bick and, as amended, the judgment is affirmed.
JUDGMENT AMENDED AND, AS AMENDED, AFFIRMED.

. The record on appeal does not indicate the capacity or means in and by which the State became a party to this litigation. According to the trial transcript, when the trial judge called the matter, the State was not named. The trial judge then asked, "There are some other Appellants I haven't named?” To which Counsel for the State and Doctors Bick, Lehman, Cromer and Smith replied, “The State of Louisiana through 'the Louisiana State University Health Sciences Center.” From the answer filed in the record and its special plea of the State Employees Medical Malpractice Act, and from the foregoing colloquy, we infer that Doctors Bick, Lehman, Cromer and Smith were employees of the Louisiana State University Health Sciences Center.

. The plaintiffs did not brief the error assigned by the answer to the appeal. Therefore, it is deemed abandoned. Rule 2-12.4, Uniform Rules — Courts of Appeal.